AMERICAN PRECISION VIBRATOR
COMPANY, Jim Guy, and Shirley
Breitenstein, Appellants,

v.

NATIONAL AIR VIBRATOR
COMPANY, Appellee.

No. 01–87–00686–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 15, 1988.

Rehearing Denied Jan. 26, 1989.

Fred M. Bosse, Houston, for appellants.

Jack O'Neill, Porter & Clements, Houston, for appellee.

Before WARREN, DUGGAN and LEVY, JJ.

## OPINION

LEVY, Justice.

Appellee, National Air Vibrator Company ("National"), brought this suit for damages and injunctive relief against appellants Jim Guy and Shirley Breitenstein, former employees, who had earlier resigned and formed American Precision Vibrator Company ("American"), a competitor in the industrial vibrator market. Appellee claims that appellants appropriated trade secrets and confidential information in violation of their fiduciary duty owed to appellee. Trial was to a jury, which found for appellant Breitenstein and against appellant Guy on the issue of appropriation and awarded $400,000 in actual damages and $500,000 in punitive damages against appellants Guy and American.

After motions by each side, the court entered judgment in accordance with the verdict and permanently enjoined appellants from manufacturing and selling certain vibrator models. Appellants' motion for new trial or, alternatively, to modify judgment, was overruled, whereupon this appeal was taken.

National was a company engaged in the business of selling air-operated piston type vibrators, conveyors, feeders, vibrator tables, and related goods. Relevant to this case are the air-operated piston-type vibrators, which are devices used to facilitate the movement of granular materials. The Neundorfer family acquired National in 1979. At that time, appellant Guy, who had worked at National for 13 years, was vice-president of engineering and sales, and appellant Breitenstein, who had worked there for 24 years, was treasurer and on the board of directors.

Following National's sale, Breitenstein and Guy both resigned from the company, Breitenstein on October 4, 1979, and Guy on December 15, 1979. They then became president and secretary, respectively, of appellant American, a new company formed in December, 1979. In March and April,

1980, American began selling air-operated piston-type vibrators, and eventually had nine or 10 models that competed directly with some of National's models. In addition to National and American, there were three to five other companies that manufactured air-operated piston-type vibrators.

Prior to December, 1979, National maintained two sets of customer cards consisting of approximately 2,000 to 4,000 cards each. Both sets were identical except that one was arranged alphabetically and the other was arranged geographically. After December, 1979, the geographically arranged set was discovered missing. Between the formation of American and the time of the trial, a period of over six years, American sold vibrators to 143 of the customers whose names were contained in the card file. National also maintained drawings and blueprints showing the details of its air-operated piston-type vibrators. National provided testimony from a witness who stated that he had been to the American office in April, 1980, while Guy was on the premises, and had seen National blueprints and the missing file of geographically arranged customer cards. Both Guy and Breitenstein denied ever having had the National blueprints or customer cards after leaving the employment of National.

Appellants' first four points of error will be considered together. They contend that the trial court erred in overruling their objection to the submission of special issue no. 2, which reads as follows: "Do you find from a preponderance of the evidence that said National Air Vibrator Company customer cards and/or blue prints constituted trade secrets?" The jury answered, "We do" as to both the customer cards and blueprints. Appellants urge that the evidence was factually insufficient to prove that the customer cards, blueprints, and drawings were trade secrets. Appellants further contend that the trial court also erred in overruling their motion for new trial because the evidence was factually insufficient to show that the customer cards, blueprints, and drawings were trade secrets.

■ A "trade secret" may consist of:

any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or *a list of customers.*

4 Restatement of Torts § 757, Comment b (1939) (emphasis added), *cited with approval in Hyde Corp. v. Huffines,* 158 Tex. 566, 586, 314 S.W.2d 763, 776 (1958). In Texas, customer lists have been recognized as trade secrets. *Collins v. Ryon's Saddle & Ranch Supplies, Inc.,* 576 S.W.2d 914 (Tex. Civ.App.—Fort Worth 1979, no writ); *see also David v. Bache Halsey Stuart Shields, Inc.,* 630 S.W.2d 754 (Tex.App.— Houston [1st Dist.] 1982, no writ).

■ Before something can be termed a "trade secret," there must be a substantial element of secrecy. *Rimes v. Club Corp. of America,* 542 S.W.2d 909, 913 (Tex.Civ. App.—Dallas 1976, writ ref'd n.r.e.).

The owner of the secret must do something to protect himself. He will lose his secret by its disclosure unless it is done in some manner by which he creates a duty and places it on the other party not to further disclose or use it in violation of that duty.

*Furr's, Inc. v. United Specialty Advertising Co.,* 385 S.W.2d 456, 459 (Tex.Civ.App. —El Paso 1964, writ ref'd n.r.e.). The *Furr's* court went on to cite 4 Restatement of Torts § 757 that,

[o]ne who discloses or uses another's trade secrets, without a privilege to do so, is liable to the other if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him....

*Id.*

■ In the case at bar, the jury heard evidence that American's customer cards were considered to be confidential. Bill Neundorfer, who had worked for 20 years as a distributor for National before he pur-

chased the company, testified that although he knew the company had a customer list, he had never been allowed to see it. He testified that the customer list information "was not divulged to anyone that [he knew] of and having worked with National for twenty years, [he] never was afforded the opportunity to inspect it."

Jim Guy testified on cross-examination as an adverse witness that, without dispute, the customer cards were confidential and that the information on them was valuable. Guy also testified that while he was an employee of National, he considered the blueprints and drawings to be "confidential and proprietary" information. However, he also testified that while he personally considered the blueprints and drawings to be confidential, they had never been so classified. Additionally, Guy answered "true" to the following question:

> As a matter of fact, the very reason you claim in this lawsuit that you didn't take NAVCO's [National's] drawings and blueprints is precisely because you knew they were confidential and you knew they were the proprietary information of NAVCO [National's]; isn't that right?

Appellants contend that the customer lists, blueprints, and drawings did not amount to protected "trade secrets" because the information contained therein was readily accessible from other sources. In support of their position, appellants cite *SCM Corp. v. Triplett Co.*, 399 S.W.2d 583 (Tex.Civ.App.—San Antonio 1966, no writ); *Brooks v. American Biomedical Corp.*, 503 S.W.2d 683 (Tex.Civ.App.—Eastland 1973, writ ref'd n.r.e.), and *Mercer v. C.A. Roberts Co.*, 570 F.2d 1232 (5th Cir.1978), wherein certain information regarding customers was denied trade secret status.

As the Texas Supreme Court has stated in *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 603, 314 S.W.2d 782, 788 (1958),

> [i]t is unquestionably lawful for a person to gain possession, through proper means, of his competitor's product and, through inspection and analysis, create a duplicate, unless, of course, the item is patented. But the mere fact that such lawful acquisition is available does not mean that he may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis. The fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means.'

*Id.* (cites omitted).

In the case at bar, there was testimony that not all the information on the blueprints and drawings was readily available from other sources. The jury heard testimony that the physical dimensions and tolerances of the component parts of National's vibrators were contained in National's drawings and blueprints and that portions of the vibrators were dimensioned to 1/10,000 of an inch. Additionally, without the precise dimensions and tolerances shown on the drawings and blueprints, National's vibrators could not be machined to operate properly. Guy testified that the tolerances between the component parts of the vibrators could not be determined by measuring one of the machines, but that they could be determined only through years of experience in designing and manufacturing vibrators.

As to the customer cards, the jury heard testimony that even though it would require a lot of work, a person who knew the types of industries that vibrators were sold to could actually contact the businesses within that industry and develop a customer list by inquiring of the purchasing agents and determining what type of equipment the business used.

In Texas, courts condemn the employment of improper means to procure trade secrets. *K & G*, 314 S.W.2d at 788, *see also Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898, 901 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.). "The question is not, 'How could he have secured the knowledge?' but 'How did he?'" *Brown v. Fowler*, 316 S.W.2d 111, 114 (Tex.Civ.App.—Fort Worth 1958, writ ref'd n.r.e.).

The rule to be deduced from the authorities seems to be that one who has a secret formula or process has a property right therein, which, though it may be lost should one rightfully acquire knowledge of it, will be protected as against those who, through breach of trust or violated confidence, attempt to apply the secret to their own use.

*Id.* at 115.

We conclude that this rule applies equally to both blueprints and/or drawings and customer lists because, under the facts shown, both constitute "trade secrets" within the forementioned definitions.

The jury heard Guy testify that because of his years of experience he was able to go through trade journals, magazines, and directories and recognize the names of customers that had actually purchased machines from him or a competitor. He was then asked if he had done just that, to which he answered, "Yes." However, when he was asked: "Do you have a list at your office of customers that you made by going through trade journals to spot customers that purchased from NAVCO [National]?" Guy's response was: "We do not have a list, but we have the directories, the books, catalogs, wherever they might have come from."

John Minges testified that he saw and briefly examined National's missing set of geographically arranged customer cards in American's offices.

The jury therefore heard evidence that strongly suggested that American had not exerted its own effort to lawfully research and prepare a list of National's customers, but had instead acquired the customer list through unfair means. As previously noted, where such a list has been unfairly acquired, it will be afforded protection as a trade secret.

The issue before us is whether or not the jury heard evidence factually sufficient to support its finding that the customer lists, blueprints, and drawings constituted trade secrets.

In reviewing factual insufficiency points, we must consider all of the evidence in the record that is relevant to the fact finding being challenged. We must sustain a "factual insufficiency" point if we determine that the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong.

*Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 787 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (cites omitted). Additionally, we note that the jury was the sole judge of the credibility of the witnesses, and it was entitled to accept or reject any testimony it wished, as well as to decide what weight to give the testimony. *Id.* at 791.

Applying the appropriate standard of review to the evidence before us, we hold that the jury's finding that the customer cards, blueprints, and drawings were trade secrets was not so contrary to the great weight and preponderance of the evidence as to be clearly wrong. The evidence was factually sufficient to support the jury's findings, and thus the trial court erred neither in submitting special issue no. 2 to the jury, nor in overruling appellant's motion for new trial.

Points of error one through four are overruled.

Appellants assert in their fifth point of error that the trial court erred in overruling their motion for new trial because there was factually insufficient evidence that the taking of the customer cards and/or blueprints constituted a breach of a fiduciary relationship.

Appellants stipulate that Jim Guy was in a position of confidence and trust with National because he was a former employee and officer. While courts have universally recognized the right of a former employee to use, in competition with his former employer, the *general* knowledge, skill, and experience acquired in his former employment, he cannot use confidential information or trade secrets so acquired. *Johnston v. American Speedreading Academy, Inc.*, 526 S.W.2d 163, 166 (Tex.Civ.App.—Dallas 1975, no writ). Not all information and knowledge acquired by a former employee should be protected un-

der this confidential relationship, and in order to be entitled to this protection, the former employee must show that the information was, in fact, a trade secret. *Hallmark Personnel of Texas, Inc. v. Franks*, 562 S.W.2d 933, 936 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ).

■ As evidenced by our disposition of the first four points of error, we conclude that the customer cards, blueprints, and/or drawings qualified as National's trade secrets. We hold, therefore, that their appropriation by Guy, who held a position of confidence and trust with National, constituted a breach of a fiduciary duty.

Appellants' fifth point of error is overruled.

■ Appellants aver in their sixth point of error that the trial court erred in overruling their motion for new trial because there was factually insufficient evidence to support the jury's answer in response to special issue no. 4 that $400,000 would compensate appellee for its loss or for appellants' benefits.

Special issue no. 4 asked the jury, "[w]hat sum of money, if any, do you find from a preponderance of the evidence would compensate National Air Vibrator Company considering the loss it sustained, if any, or the benefits received by American Precision Vibrator Company, if any ...?" To which the jury replied $400,000.

Warren Cole, a certified public accountant and partner with the national accounting firm of Ernst & Whinney, reviewed all of American's invoices that documented the sale of certain vibrators from 1980 forward, American's income tax returns, National's income and financial statements, National's price lists, and information regarding costs associated with producing vibrators.

In their brief, appellants confuse the terms "profit" and "benefit." Cole distinguished benefits from profits, explaining that "benefit" is a measurement of the financial result directly attributable to American's having sold the nine equivalent competing models of vibrators. "Profit," on the other hand, is a measure of all revenues and all expenses, whether or not attributable to the sale of the nine models of vibrators. "Profits made" would not necessarily be an accurate reflection of "benefits received," but might rather reflect either good or bad business sense and management.

In special issue no. 4, the jury was asked to consider the loss National sustained or the benefit received by American.

After reviewing financial and business records supplied by both National and American, Cole testified that National's losses were somewhere between $159,000 and $893,000, and that the benefit realized by American was somewhere between $152,000 and $491,000.

Therefore, after applying the appropriate standard of review, we conclude that it was not contrary to the great weight and preponderance of the evidence for the jury to find that National was damaged and should receive $400,000 in compensation, an amount that was within the limits set by Cole's testimony.

Appellants' sixth point of error is overruled.

In their seventh and eighth points of error, appellants assert that the trial court erred in overruling their motion to modify the judgment by omitting the grant of injunctive relief against them and in finally granting the permanent injunction because there was no special prayer in plaintiff's/appellee's petition for such relief.

■ As a prerequisite to the granting of an injunction, the pleadings and prayer must state the particular form of injunction sought and that the court decrees, and the prayer must specify the type of judgment sought. *Fant v. Massie*, 451 S.W.2d 774, 776 (Tex.Civ.App.—Austin 1970, writ ref'd n.r.e.). The prayer in plaintiff's third amended original petition, on which the case was tried, requested in pertinent part that "it be awarded judgment against APV [American], Guy and Breitenstein, jointly and severally, as sought above ... and that it have such other and further relief, general and special, legal and equitable, to which it may show itself justly entitled."

In paragraph VIII of plaintiff's third amended original petition, National pleaded that it was entitled to:

a permanent injunction enjoining Guy, Breitenstein and APV [American], individually and collectively, their successors, assigns, employees and persons in active concert or participation with them, from the following acts and courses of conduct:

1. Contacting or communicating with any person or company listed on NAVCO's [National] customer cards for the purpose of selling or leasing to any such person or company any type of air vibrator manufactured by APV [American] which directly competes with any type of air vibrator manufactured by NAVCO [National];

2. Selling or leasing to any person or company listed on NAVCO's [National] customer cards any type of air vibrator manufactured by APV [American] which directly competes with any type of air vibrator manufactured by NAVCO [National]; and

3. Selling or leasing any air vibrators or any component parts thereof manufactured by APV [American] by the use of or with the aid and assistance of NAVCO's [National] drawings and blueprints.

Appellee specifically pleaded for a permanent injunction and, in its prayer, asked that judgment be awarded "as sought above," obviously referring back to its pleadings. By this language it is clear that appellee's prayer included the pleaded-for permanent injunction, and we conclude that appellee's pleadings gave adequate notice to appellants as to the relief being sought.

Appellants' seventh and eighth points of error are overruled.

In their points of error nine and 10, appellants urge that the trial court erred in overruling their motion to modify the judgment granting injunctive relief against Shirley Breitenstein and also in granting the injunctive relief against her because there was no jury finding against her to support either one.

In answer to special issue no. 1, the jury found that Breitenstein had not taken the customer cards and/or the blueprints from National when she terminated her employment there. However, in answer to special issue no. 5, the jury found that Guy or Breitenstein or American would in all reasonable probability continue to use the trade secrets or confidential information in competition with National. It is this latter finding, not the fact that she did not take the cards, that justifies the granting of injunctive relief.

We hold, therefore, that contrary to appellants' argument, the injunctive relief granted against Breitenstein was supported by a jury finding against her.

Appellants' ninth and 10th points of error are overruled.

Appellants urge in their 11th and 12th points of error that the trial court erred in overruling their motion to modify the permanent injunction and in granting the permanent injunction because, as granted, it provided relief in excess of that which appellants pleaded for.

Appellants' operative third amended petition (as set out above) requested only that American be enjoined from the acts of "selling or leasing" and "contacting or communicating." The petition makes no mention of seeking to enjoin American's manufacturing efforts. In fact, it specifically requests that the injunction against "selling or leasing" and "contacting or communicating" be applied to air vibrators manufactured by American.

However, the judgment enjoins Guy, Breitenstein, and American from "manufacturing and/or selling APV air vibrator model nos. BV–100, BV–125, BV–162, BV–200, BV–300, BV–400, BV–800, HCV–300 and/or MV–162–GM, any component parts thereof, and/or any other air vibrator derived from or patterned after drawings and/or blueprints of drawings of plaintiff." Courts are without authority to grant injunctive relief beyond or in addition to that for which there is specific pleading. *Fairfield v. Stonehenge Ass'n Co.*, 678 S.W.2d 608, 611 (Tex.App.—Houston [14th Dist.] 1984, no writ). The injunction, therefore, to the extent that it enjoins appellants from

manufacturing vibrators, constitutes relief beyond that which appellants pleaded for, and the court was accordingly without authority to grant it. We recognize that manufacturing without authority to sell the vibrators may be useless, but feel constrained, upon consideration of appellants' point of error, to so modify the trial court's order.

Appellant's final point of error is sustained.

The judgment of the trial court is in part affirmed, but that portion of its injunction prohibiting Guy's, Breitenstein's, and American's manufacturing of APV air model nos. BV–100, BV–125, BV–162, BV–200, BV–300, BV–400, BV–800, HCV–300, and MV–162–GM vibrators is dissolved.