American Derringer v. Bond 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-263-CV

        AMERICAN DERRINGER CORPORATION,
                                                                                       Appellant
        v.

        GREG BOND, INDIVIDUALLY AND 
        D/B/A TEXAS ARMS,
                                                                                       Appellee
 

From the 170th District Court
McLennan County, Texas
Trial Court # 94-103-4
                                                                                                    

O P I N I O N
                                                                                                    

          This appeal involves trade secrets and malicious prosecution. We find "no-evidence" to
support a finding that a company did not have probable cause to institute proceedings to enjoin a
former employee from selling a competing product. We reverse the judgment for the employee
on his malicious prosecution claim and render judgment for the employer.
          In August of 1991, American Derringer Corporation (ADC) hired Greg Bond, an engineer
who was also a gun collector but who had never before worked for a gun manufacturer. As its
name implies, ADC manufactures derringer-type handguns. Bond worked for ADC for almost
a year before he was fired. Shortly afterwards, ADC learned that Bond's company, "Texas
Arms," intended to market a gun similar to one of its products and sued him for misappropriation
of trade secrets. The court issued an ex parte temporary restraining order prohibiting Bond from
"manufacturing, marketing, soliciting or offering for sale, advertising, promoting, or otherwise
displaying a Derringer styled pistol" with certain enumerated features. Bond immediately filed
an answer and a motion to dissolve the restraining order. The court dissolved the restraining order
three days after its issuance. Bond then filed a counterclaim for malicious prosecution.
          A jury found: (1) Bond did not convert any of ADC's trade secrets; (2) ADC lacked
probable cause to bring the suit and obtain the injunctive relief; (3) ADC acted with malice; and
(4) Bond sustained $131,500 in actual damages. Judgment for Bond was entered on the verdict.
          ADC presents six points of error complaining of (1) the legal and factual sufficiency of the
evidence to support the jury's finding that ADC lacked probable cause to pursue its claim against
Bond, (2) an erroneous award of damages for the diminished value of Bond's business, (3) the
legal and factual sufficiency of the evidence to support the jury's award of damages for mental
anguish, (4) two instances of error in the charge, and (5) the award of attorney's fees. In a cross-point, Bond asserts that the court erred in refusing to submit jury questions concerning his claim
that ADC was in violation of the Texas Antitrust Act. Tex. Bus. & Com. Code Ann. §§ 15.01-.52 (Vernon 1987 & Supp. 1996).
TRADE SECRETS
          Before we address the points of error, we briefly discuss the law governing trade secrets
as it relates to this case. We do so because that is the theory upon which ADC sought and
received the injunctive relief which, in turn, became the basis for Bond's counterclaim for
malicious prosecution. We stress at the outset that we do not question the jury's finding that Bond
had not misappropriated ADC's information—a finding that has not been attacked. Our inquiry
is limited to whether the jury was justified in finding that ADC had no probable cause to believe
that Bond had violated the confidential relationship and wrongfully exploited its trade secrets.
trade secrets generally
          ADC's suit was brought on the theory that Bond had misappropriated information used by
ADC in the design, manufacture, and marketing of its products. This cause of action was
described in section 757 of the original Restatement of Torts:
One who discloses or uses another's trade secrets, without a privilege to do so, is
liable to the other if (a) he discovers the secret by improper means, or (b) his disclosure
or use constitutes a breach of confidence reposed in him by the other in disclosing the
secret to him . . . .
Restatement of Torts § 757 (1939).



          A "trade secret" may consist of any formula, pattern, device or compilation of information
which is used in one's business, and which gives him an opportunity to obtain an advantage over
competitors who do not know or use it. Computer Assoc. Int'l, Inc. v. Altai, Inc., 918 S.W.2d
453, 455 (Tex. 1996). Generally it relates to the production of goods, as, for example, a machine
or formula for the production of an article. Hyde Corp. v. Huffines, 158 Tex. 566, 314 S.W.2d
763, 776 (on rehearing) (quoting Restatement of Torts § 757), cert. denied, 358 U.S. 898, 79
S.Ct. 223, 3 L.Ed.2d 148 (1958). "A trade secret may be a device or process which is patentable;
but it need not be that. It may be a device or process which is clearly anticipated in the prior art
or one which is merely a mechanical improvement that a good mechanic can make. Novelty and
invention are not requisite for a trade secret as they are for patentability." K & G Oil Tool &
Serv. Co. v. G & G Fishing Tool Serv., 158 Tex. 594, 314 S.W.2d 782, 789 (1958) (quoting
Restatement of Torts § 757). The mere fact that knowledge of a product might be acquired
through lawful means such as inspection, experimentation, and analysis does not preclude
protection from those who would secure that knowledge by unfair means. See id. at 788. "The
question is not, `How could he have secured the knowledge?' but `How did he?'" American
Precision Vibrator Co. v. National Air Vibrator Co., 764 S.W.2d 274, 277 (Tex. App.—Houston
[1st Dist.] 1988, no writ) (citing Brown v. Fowler, 316 S.W.2d 111, 114 (Tex. Civ. App.—Fort
Worth 1958, writ ref'd n.r.e.)).
duty of an employee
          Upon the formation of an employment relationship, certain duties arise apart from any
written contract. Miller Paper Co. v. Roberts Paper Co., 901 S.W.2d 593, 600 (Tex.
App.—Amarillo 1995, no writ). One of those duties forbids an employee from using confidential
or proprietary information acquired during the relationship in a manner adverse to the employer. 
Id.; Numed, Inc. v. McNutt, 724 S.W.2d 432, 434 (Tex. App.—Fort Worth 1987, no writ). This
obligation survives termination of employment. Miller Paper, 901 S.W.2d at 600; Auto Wax Co.,
Inc. v. Byrd, 599 S.W.2d 110, 111 (Tex. Civ. App.—Dallas 1980, no writ). Although this duty
does not bar use of general knowledge, skill, and experience, it prevents the former employee's
use of confidential information or trade secrets acquired during the course of employment. Miller
Paper, 901 S.W.2d at 600-01; American Precision, 764 S.W.2d at 278. "In Texas, courts
condemn the employment of improper means to procure trade secrets." American Precision, 764
S.W.2d at 277.
          When a claim of improper disclosure or use of trade secrets arises from a confidential
relationship, such as between an employer and an employee, the injured party is not required to
rely upon an express agreement that the offending party will hold the trade secret in confidence. 
See Hyde Corp., 314 S.W.2d at 770 (quoting the Restatement of Torts); Gonzales v. Zamora, 791
S.W.2d 258, 265 (Tex. App.—Corpus Christi 1990, no writ). Likewise, the absence of an ulterior
or improper motive in entering into the relationship will not preclude relief for an injured party. 
See Hyde Corp., 314 S.W.2d at 770. "The gravamen of [such a complaint] is breach of
confidence." Id. The question is: Has the offending party abused the trust that was reposed in
him incident to a confidential relationship with the injured party? See id. (quoting from E. I.
DuPont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed.
1016 (1917)).
          The employer must show that the information was, in fact, a trade secret.


 American
Precision, 764 S.W.2d at 279 (citing Hallmark Personnel of Texas, Inc. v. Franks, 562 S.W.2d
933, 936 (Tex. App.—Houston [1st Dist.] 1978, no writ)). Items such as customer lists, pricing
information, client information, customer preferences, buyer contacts, market strategies,
blueprints, and drawings have been shown to be trade secrets. See, e.g., Miller Paper, 901
S.W.2d at 601 (affirming temporary injunction against former employees restricting use of
confidential information); American Precision, 764 S.W.2d at 278 (evidence factually sufficient
to support finding that items were trade secrets).
          The protection of a trade secret is a well-recognized objective of equity. K & G Oil Tool,
314 S.W.2d at 790 (injunctive relief upheld after design of an oil field tool was obtained by a
licensee in violation of an express agreement not to disassemble the tool); Hyde Corp., 314
S.W.2d at 770 (trade secrets, distinguished from patents, subject to protection under the equitable
jurisdiction of state courts).
summary
          In a 1987 Texas Bar Journal article, we find this summary:
Under Texas law, a person is liable for the disclosure of trade secrets if he discovers the
secret by improper means or his disclosure or use constitutes a breach of confidence
reposed in him by the other in disclosing the secret to him. Mercer v. C.A. Roberts Co.,
570 F.2d 1232, 1238 (5th Cir. 1978); Hyde Corp., 314 S.W.2d at 769. Injunctive relief
may be granted when an employee breaches his confidential relationship with his employer
in order to unfairly use a trade secret, and the employer is not required to rely upon an
express agreement to hold such trade secrets in confidence.
Marcia A. Crone, The Departing Employee—Prevention of Competition and Protection of Trade
Secrets, 50 Tex. B.J. 372, 374 (1987). And, "[a] former employee is free, however, to use in
later employment the general skills, knowledge, and experience which he has acquired, even if the
former employment has acted to increase his skills and if such training is complex and extensive." 
Id. at 375. The article also discusses the "commonly accepted definition" of a trade secret, as
"found in the Restatement of Torts § 757 (1939)." Id. at 374. Finally, the article states: "There
are several remedies available to protect . . . trade secrets. Often, the first remedy sought by an
employer is a temporary restraining order, followed by a temporary and then a permanent
injunction. [citations omitted] This remedy accomplishes the employer's goal of obtaining
immediate cessation of the employee's violative conduct under threat of the court's exercising its
powers of contempt." Id. at 376.
          Having visited the law of trade secrets and the duties of employees, we turn to the law
regulating suits for malicious prosecution. 
MALICIOUS PROSECUTION
          A person who obtains an injunction wrongfully is liable for damages caused by issuance
of the injunction. DeSantis v. Wachenhut Corp., 793 S.W.2d 670, 685 (Tex. 1990), cert. denied,
498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). There are two separate causes of action
for wrongful injunction: one upon the bond ordinarily filed to obtain the issuance of the injunction;
another for malicious prosecution. Id. Here, Bond chose to file the latter as a counterclaim in the
same proceeding in which the injunction was issued.
          A malicious prosecution claim may arise out of a prior criminal proceeding or a prior civil
proceeding, the former being far more prevalent. To prevail in a suit alleging malicious
prosecution of a prior civil claim, the plaintiff must establish: (1) the institution or continuation
of civil proceedings against the plaintiff; (2) by or at the insistence of the defendant; (3) malice
in the commencement of the proceeding; (4) lack of probable cause for the proceeding; (5)
termination of the proceeding in plaintiff's favor; and (6) special damage. Texas Beef Cattle Co.
v. Green, 39 Tex. Sup. Ct. J. 523, 524 (April 25, 1996) (citing James v. Brown, 637 S.W.2d 914,
918 (Tex. 1982)).


 One accused of malicious prosecution is rightly aided by "an initial
presumption that a defendant acted reasonably and in good faith and therefore had probable
cause." Ellis County State Bank v. Keever, 888 S.W.2d 790, 794 (Tex. 1994) (malicious
prosecution suit after an unsuccessful criminal prosecution) (quoting Akin v. Dahl, 661 S.W.2d
917, 920 (Tex. 1983), cert. denied, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984), a
malicious prosecution suit following an unsuccessful application for temporary guardianship due
to mental incompetency).
THE EVIDENCE
A.
          Trial was held in May of 1995. ADC presented four witnesses: Elizabeth Saunders,
president of ADC; Dwight L. Edwards, the head machinist for ADC; Roberta Geer, a customer
of ADC; and Steven Eskridge, an expert witness.
elizabeth saunders
          Elizabeth Saunders testified that she was the president of ADC, having succeeded her
husband, Robert Saunders (Bob), when he died in 1993. She said that ADC's customers fall into
one of three categories: distributors who purchase one hundred or more guns within a twelve
month period, jobbers who purchase five or more guns, and individuals who buy just one gun. 
Distributors and jobbers are required to hold a federal firearms license. She described the various
models of the guns that ADC manufactured. Two-thirds of all guns sold by ADC were "Model
1" derringers, about 40,000 of which had been manufactured since 1988.
          Part of her duties with ADC involved the handling of customer complaints and comments
about the product. These communications were directed, first, to Bob Saunders, then to the
appropriate department within the company. They were considered confidential. A large number
of complaints about the Model 1 had been made to the company, many about safety aspects of the
gun. Elizabeth said that the company "had several lawsuits pending because of that."
          Elizabeth explained her understanding of the "casting" process, by which a foundry makes
the barrels and other components of the guns that are to be manufactured. This involves drawings,
models, tolerances, acceptances, a mold for each component, and inspections and x-rays of the
finished components. She said that ADC retained ownership of all of the molds that the foundry
used to make the components and that they are kept "locked up."
          Prior to 1991, the company had no plant manager or engineer among its employees. Bob
Saunders, who had acquired the ability to design and manufacture guns "on the job," performed
those functions. In 1991, because of the safety complaints, the company sought an engineer to
work on those and other problems. ADC hired Bond to "find out what the problems were." 
During the first six or seven months, Bond set up a "gun drill," a machine designed to drill a hole
with the perfection needed to make a gun barrel. When the gun drill was "up and running," it
helped increase production. He also created a "flow chart" to track the process of assembling
guns. Elizabeth said that Bond was acting as the plant manager and had access to everything that
ADC had, including all drawings developed for the company for the manufacture of its guns. He
also worked with companies that produced the components for ADC and had full access to
complaints and comments made by customers about the products.
          Elizabeth said that various employees of the company discussed solutions to the safety
problems, such as "a retractable firing pin," "a rebounding hammer," and "a cross-bolt safety,"
in Bond's presence. Cosmetic changes, such as "an octagonal barrel," which the company wanted
to offer as a customer option, were also discussed with him.
          In July of 1992, Bob Saunders fired Bond because of a disagreement over allowing
employees time-off.
          In January of 1993, Bob Saunders learned that Bond was displaying "a gun that looked
similar to ours" at a "Shot Show," a large trade show for the firearms industry. Elizabeth said she
was surprised that Bond was offering a similar weapon only six months after he had been fired. 
Because Bob Saunders was sick and later died, nothing was done with the information until just
before the 1994 Shot Show. A few weeks before that show, ADC sought legal counsel because
Elizabeth "felt [Bond] used the knowledge of American Derringer to be able to produce the gun
in the time he did, and also putting the [retractable firing pins, the rebounding hammer, and the
cross-bolt safety] on the guns that we had spoke about previously in the past when he was hired
there." ADC obtained Bond's literature describing his gun as the "Defender." She said that some
of the features that the Defender's brochure described were features that ADC had sought to get
Bond to produce for its guns.
          Elizabeth said that she had seen Bond "doing a lot of drawing" while employed at the
company. She further said that the frame of the Defender "looked a lot like our frame"; that the
Defender was offered with interchangeable barrels which ADC had offered in the past; that "the
calibers he was offering it in was similar to our calibers"; and that "he incorporated all the things
that -- on this gun that we had basically discussed while he was employed . . . that needed to be
on for safety purposes." When the directory for the 1994 Shot Show came out and she knew that
Bond was going to be there, Elizabeth made the decision on behalf of ADC to take legal action.
          On cross-examination, Elizabeth said that the Model 1 did not have a cross-bolt safety but
had a "hammer block safety system." She described warnings in ADC's brochures about some
of the safety problems she had described and acknowledged that Bob Saunders discussed some
safety problems with Bond before he was hired. Bond also introduced through her testimony a
"parts list" provided by ADC with several models of guns, showing an "exploded view" of a
typical weapon and listing the parts generally used.


 Elizabeth said that other companies who
manufacture guns may also use the same casting method as ADC and identified a Waco newspaper
article written about ADC that identified the process.
          Elizabeth said that one of her larger distributors, Ammunition Consulting Services (ACS),
told her that Bond was soliciting ADC's customers and sent her literature describing the Defender. 
ACS also sent ADC copies of (1) an invoice it had received from "Texas Arms" dated February
3, 1993, for one gun and (2) a letter dated August 25, 1993, on Texas Arms letterhead, signed by
Bond, explaining "start-up delays." She did not, however, know of any other customer of ADC's
that Bond had solicited.
          Elizabeth said that she did not know Bond's background before coming to ADC, other than
that he was "a mechanical engineer," and that she did not review his personnel file before taking
legal action against him. She said that he was hired to do design work and serve as the plant
manager, making sure that production went smoothly and that the employees performed their
assigned tasks. She acknowledged that ADC's production increased after Bond arrived, but said
that by the summer of 1992, "we weren't getting any guns out the door." ADC did not hire
another engineer until almost two years after Bond left.
          On redirect examination, Elizabeth said that a review of Bond's personnel file showed he
was experienced as a journeyman tool and die maker and that, with the confidential information
he had learned at ADC, should have no trouble in producing a gun.
dwight l. edwards
          Dwight Edwards, known as "Ikey," was the shop foreman at ADC for eight years prior
to trial. He had been a machinist for nineteen years. He described the type of work he did for
ADC, including the solving of some design problems.
          Edwards said he had seen Bond doing drawings. He said that Bond was not at ADC when
they worked on the octagonal barrel. The rebounding-hammer work was done seven or eight
months after Bond left, although another employee told him that Bond had discussed it. Edwards
said he had discussed the cross-bolt safety, which "goes hand in hand with the rebounding
hammer," with Bond. He said that, before Bond was fired, Bond told him that he and his brother
wanted to start a competing company "because they wanted to, you know, put [ADC] out of
business." 
          On cross-examination, Edwards said that Bond was hired to be the plant manager, to design
and build tools, and to increase and improve production. He agreed that production had increased. 
He said Bond made some modifications on the firing pin holes, the firing pins, and the "recoil
plates," mostly on the Model 1. He examined the Defender and said that it had an "automatic
extractor" which most of ADC's models did not have. He agreed it would not take a significant
amount of work to add that feature. He said he created an octagonal barrel for a Model 1 in about
twenty minutes, right before the 1994 Shot Show. He had no knowledge of Bond's taking
anything from ADC nor of his contacting customers or suppliers. He said Bond never discussed
the "rebounding hammer" feature with him. Edwards said that the Defender "to me is a mixture
of a Model 1 and your DA's."



          Edwards said Bond was fired during an employees' meeting—that Bob Saunders "just kind
of stopped abruptly, turned to Greg Bond, and said You're fired." During that meeting, Bob also
discussed the fact that research and development were not being done.
roberta geer
          Roberta Geer testified that she met the Saunders at the 1991 Shot Show in Dallas. She first
learned of Texas Arms, Bond's company, at the 1993 Shot Show. She said that when she first saw
the Defender, "it looked very much like American Derringer's." Later, she said it was "a clone,
a knock-off, an outright copy, whatever you want to use." Geer said that she dealt mostly in "little
derringers" for their company, Ammunition Consulting Services, while her husband, Dick, dealt
with ammunition and collectibles. She had over 700 pistols "in the house or in the business,
fooled with, have shot or had something to do with." She said ADC makes an "excellent product"
with a few problems.
          Geer said the Defender she saw at trial looked like the one she had originally seen in 1993,
except that it did not have a trigger guard then. She had later seen a picture of one that did have
a trigger guard in a magazine. She said ADC's guns do not have trigger guards. She agreed that
the Defender had several different features, such as the rebounding hammer, a spring-loaded lever
to open the barrel, and a positive cross-bolt safety system. She examined five guns from different
manufactures and said that, while all have similarities and differences, the ADC gun and the
Defender looked more alike.
          Geer said she ordered a Defender at the 1993 Shot Show, but never received it. She told
representatives of ADC that the new gun "looked a lot to me like their product." She had no
knowledge that Bond had taken anything from ADC.
Steven Eskridge
          Steven Eskridge testified as an expert witness in the field of weapons. He is a graduate of
West Point with a degree in mechanical engineering, who served in the army for four years and
ran a gun-barrel manufacturing company in South Carolina. At the time of trial, he was building
high-grade competition and hunting rifles.
          Eskridge had examined ADC's Model 1 and Bond's Defender, making a piece-by-piece
comparison of the two. He displayed pictures that showed the two assembled, along with a Davis
derringer. He also displayed pictures of the weapons disassembled and pictures of the components
of each that he determined to be similar. His overall opinion was that the Defender was, from a
general mechanical standpoint, really no different than the ADC Model 1. The frame of the
Defender, although somewhat modified and larger, was "generally the same frame." The "spring
hammer guide" on the Defender, although modified from the Model 1, was "the same thing." 
Noting that the Defender's "torsion spring," the part that acts to return the hammer, was on the
opposite side from the Model 1's, Eskridge said that the hammers were "virtually" the same. The
triggers were virtually the same, except for "a little lip coming up here on the Defender trigger." 
Other differences, he said, were cosmetic.
          Eskridge testified that, at ADC's request, he modified a Model 1 to incorporate the
"rebounding hammer" feature he found on the Defender. He said he did so from an originally cast
part in about five or six hours. The modification required a different spring, which he made, and
milling of the hammer to accommodate the spring and allow the spring guide clearance. When
he completed the modifications, Eskridge shot the modified Model 1. He said that these same
features appear in ADC's "DA .38."
          On cross-examination, Eskridge agreed that the frames of the Defender and the Davis
derringer were "outwardly" more similar than the Defender and the Model 1. He said the triggers
and the hammers on all three guns were similar and the Defender was a "higher quality gun."
          Eskridge said the concept of the octagonal barrel had been used on guns for many years. 
The rebounding hammer was not commonly used on derringers, although the idea was not unique
in the gun industry. He further said that the automatic extractor, the cross-bolt safety, and the
spring-loaded retractable firing pin are found in other guns and all are common knowledge in the
industry.
B.
          Greg Bond testified on his own behalf and presented several other witnesses.
greg bond
          Bond said he grew up in West Texas and had used guns since he was ten or eleven years
old. He graduated from the University of North Texas with a degree in industrial technology. 
After college, he went to work at Tye Manufacturing as a tool and die apprentice, working under
a master tool and die maker. After five years, he received a certificate as a journeyman tool and
die maker. Later, he was awarded a degree in mechanical engineering at Texas Tech University. 
While there, he designed and built a gun to fire caseless ammunition. He said these studies
employed techniques that he used while working for ADC.
          After graduation from Texas Tech in 1988, he went to work for Texas Instruments as a
mechanical design engineer in the tooling department. While at TI, he heard about an
advertisement for a position at ADC. He contacted the company, visited its plant, and interviewed
with Bob Saunders. He said that Bob did not ask him about his qualifications, but spent most of
the time talking about how many back-orders the company had and how they needed to speed up
production to meet demand. They looked at the gun drill and Bob asked if Bond thought he could
make it work; he said "yes." He said their luncheon meeting was not what he would describe as
an interview, but rather was "a real casual meeting." He said they went to Saunders' home, test-fired some of the guns, and "that pretty much concluded the interview." After negotiations, he
began work on August 5, 1991.
          Bond explained the process of "investment casting" to make molds for product parts. He
said he had owned a derringer before going to ADC and was aware of some of the safety problems
that derringers had. He said that before he accepted the job at Texas Instruments, he had sent a
lot of resumes to gun companies because he had always had an interest in firearms.
          Bond said that, when he started working for ADC, the company had no safety manual or
employee manual, both of which he felt needed to be developed. His initial task was to fix
production problems associated with the "DA." That took about a month and a half. Next, he
worked on a safety problem associated with the DA. He then began work on the gun drill,
working on it until late November, when it was placed into operation and "increased the
production of the barrels tremendously."
          He next worked on the problem of drilling a necessary hole in the barrel of the Model 1
in a precise location—to correct a procedure that allowed the hole to be drilled in different
locations. He said that sixty per cent of his time was spent on production matters and the rest was
spent on "general engineering" and employee relations. He said that, although he was hired as
"plant manager," he had no authority to fire or discipline the employees who worked in the plant. 
 He hired one person just before he left ADC.
          Bond testified that the Model 1 had a lot of safety problems, which he addressed, including
the fact that the safety was so small that it allowed the hammer to hit the firing pin if the weapon
were accidentally bumped. He redesigned the safety, but Bob Saunders never authorized the
change. He suggested several other changes in the production process that were never
implemented.
          Bond said that he did "a lot" of drawings of tooling fixtures and general tooling designs
while at ADC. He said he kept the drawings when he left, as a sort of "portfolio" that might be
helpful "in the interview process." Bond testified that his Defender incorporated some of the
features Bob Saunders had rejected for the ADC guns, including at least one modification based
on a customer complaint.
          Bond said he had no advance warning when he was fired by Bob Saunders. He related
incidents about work he had done and recommendations he made that were never addressed or
were ignored by Saunders. He said he saw a copy of a letter near the copy machine before he was
fired that indicated another employee was going to be promoted to plant manager. He
acknowledged that, at the time he was fired, the Saunders were upset about the rate at which a new
project was advancing.
          Bond testified about the features he incorporated into the Defender:
          •        the octagon-shaped barrel had been discussed at ADC for use on the Model 1, but
"it just kind of died"; it is found on weapons made by other manufacturers;
          •        the automatic extractor was different on the Defender only in that he used a
"compression spring," which was used by other manufacturers and cost about
thirty-two cents; ADC did not use it and he said it was not discussed while he was
there; 
          •        the retractable spring-loaded firing pin was used by ADC and in "practically all"
of the derringers on the market; it was discussed while he was with the company;
          •        the cross-bolt safety used by other companies, but not by ADC; he said it is one of
the most common safeties on all firearms; prior to his leaving ADC, another
employee asked if he thought ADC could put a cross-bolt safety on the Model 1;
Bond said he "passed it off" and never heard of it again; and
          •        the rebounding hammer, which the Defender had and the ADC guns did not, is
"common to self-loading semi-automatic pistols" and is a "common method of
keeping the hammer off the firing pin"; it was never discussed at ADC.
He said that he was aware of all of these features before he went to ADC.
          Bond testified that he "toyed with" the idea of designing a gun before he was fired by
ADC. It never went beyond the "concept" stage and he had committed nothing to paper. He said
he had spoken to Don Pilant, the owner of Custom Molds and Tools in Waco. He told Pilant that
"things were getting kind of flaky down at American Derringer, and I really didn't know what was
going to happen, but if -- if I was asked to leave, fired, laid off, whatever, I thought I might want
to come up with a different gun." He decided to design and build a gun "the day I was fired." 
His initial concept included having a trigger guard; a longer grip that would accommodate at least
two fingers, a feature that was an option on ADC guns; and interchangeable barrels, an idea that
Bob Saunders rejected before Bond went to work at ADC, but which was discussed while he
worked there.
          He said he started to design his gun right after he was fired, using a computer with a design
program that he had borrowed about a week earlier. It took two and one-half months to design
a gun and it went through "four generations of design" to get to the Defender. He said two and
one-half months was a "fairly short" time to design a gun but "certainly not unusual." Custom
Molds and Tools had computer-driven machinery that sped up the process; he was designing as
Custom Molds and Tools was working on prototypes. He said he was spending between eleven
and sixteen hours a day "because I wanted to make it to the Shot Show in 1993." By the time the
show opened, he had six guns for display. He said that, although the prototypes and the
production models look the same, he did a "complete redesign" of the gun between the time of the
1993 Shot Show and the beginning of production. The rebounding hammer and the locking lever
were both redesigned, the first completed in June of 1993 and the second completed about two
months later. He said he used the knowledge, training, and experience that he received at North
Texas, Tye Manufacturing, Texas Tech, Texas Instruments, and ADC in designing and building
the Defender.
          Bond compared guns from six manufacturers and said that all were "patterned after the
Remington style derringer." He said that other frames were closer in design to the ADC derringer
than the Defender. He said that the ADC Model 1 and the Defender were modeled after the
Remington pattern derringer of 1866. He said he would have designed the same gun for ADC if
they had wanted him to.
          Production of the Defender began in March of 1994. Bond said he obtained suppliers by
consulting the Thomas Register, a listing of manufacturing concerns in the United States, available
in the public library. His customer list came from contacts made at the 1993 Shot Show. He said
he did not "steal" any customers from ADC, solicit any of its customers, remove any drawings
from ADC other than copies of those he made, or take the company's research and development.
          On cross-examination, Bond said his experience with derringers before working for ADC
was limited to his ownership of two of the guns and perhaps working on other peoples' guns; he
had no experience in the manufacture of derringers. He agreed that he had chosen to design a
derringer, with which he had eleven months experience at ADC, rather than a rifle, a shotgun, or
a larger pistol. He said he wanted to compete with Bob Saunders. Asked if he was free to use an
idea that ADC was using after he left, Bond said, "Once I was fired, if -- if there was an idea and
I needed -- you know, like in any kind -- Yeah, you can use those ideas, if it's not patented." He
said he was made aware of no confidential information at ADC, although he denied believing that
all its information was in the public domain. He knew that ADC did not publish customer
complaints. 
          He restated that, prior to leaving ADC, he had (1) "make some sketches" of guns, (2)
talked with a machine shop about producing a gun, (3) borrowed a computer with design
capabilities, (4) looked into the feasibility of producing a gun in the future, (5) heard "a lot of
rumors," and (6) gotten a lot of negative feedback from Elizabeth Saunders. He said he described
the proposed gun to Pilant in "very loose terms," but said that he wanted "to do something along
the [lines of a] Remington pattern derringer." 
          Bond admitted that he obtained information about customer complaints while at ADC and
that his duties included addressing those complaints. He said that all of the drawings that were
ever made of the Model 1 were available to him and that he had keys to the ADC offices and the
code to the alarm system. He said that customer feedback is a primary determinant of the design
of a gun.
          Bond said that when he designed the Defender on the computer he worked from a blank
page looking at "several derringers and other types of guns," including an ADC Model DA .38. 
He said he did not have a Model 1, although he had a Model 1 hammer to look at. He also said
that he attempted to address known hazards, such as accidental or unintentional discharge. His
solution was the cross-bolt safety, a solution that was discussed while he was at ADC. Other
features he considered or used had been discussed at ADC: a larger grip to accommodate more
than one finger; a rebounding hammer, which the Model DA .38 had; and interchangeable barrels. 
He also sought to solve the problem that most derringers, including the ADC guns, shot high.
          On redirect examination, Bond maintained that knowledge of the design of derringers is
in the public domain, available in books and parts lists. He said that the design of the Defender
was "totally different" from that of the Model 1. 
nanette boyer
          Nanette Boyer, an employee of Texas Instruments, testified that she hired Bond to work
for TI. She said he was "a very strong design engineer and already came to TI with a lot of
experience from his tool and die maker days." She said he was "very honest" and had "very high
integrity." She would hire him again.
frank turner
          Frank Turner owns and operates Classic Arms Company in Burnett, a manufacturer of
small single-shot rifles. He said he had been working with guns for forty years and had designed
and built guns. He said his company built two molds for the Defender—a hammer mold and a
hammerhead mold. He described the Thomas Register (a listing of manufacturers and products),
World Guide to Gun Parts (giving parts breakdowns), and Numrich Gun Parts as publications
available to the general public. He described Bond as "very knowledgeable in design" and the
Defender as "a good piece." He said Bond was, in his opinion, an honest man. 
dee wayne whitehead
          Dee Wayne Whitehead, a custom gunsmith, said he had owned and worked on derringers
and that the design of derringers is in the public domain. He said that the Defender was a safer
or higher-quality gun than most derringers because of such features as the rebounding hammer,
a barrel locking mechanism, the safety, and the hammer system.
steven wayne carter
          Steven Wayne Carter did assembly work on a double-action derringer for ADC and later
worked on the Model 1. He became plant manager when Bond left. He said that Bond developed
an employee handbook and generally increased production while he was with ADC. He said the
idea of a rebounding hammer was not discussed at ADC until after they saw the Defender at the
Shot Show and that no work was done at ADC by Bond on interchangeable barrels. He said that
ideas about an automatic extractor, a trigger guard, the cross-bolt safety, and other "safety
features" were talked about among the employees and some of those features were presented to
either Bob or Elizabeth Saunders.
          He said the reason the Geers ordered the Defender at the Shot Show was to provide it to
ADC for examination. On cross-examination, he said that, although he assisted ADC before and
after the suit was filed by telling Elizabeth Saunders things he had learned "through investigation
or otherwise," he warned Bond that ADC was about to file suit against him.
garnett shelton grant, jr.
          Shelton Grant, a gun designer and builder, said he worked for ADC assembling derringers
for three and one-half years in the early 1980's. He said that Bob Saunders was not very amenable
to changes in the Model 1, although several changes were discussed. He said he saw the Defender
at the Shot Show in Houston, met Bond, discovered they had a common interest in guns, and
discussed going into business with him.
don pilant
          Don Pilant owned Custom Molds & Tools in Waco. He said Bond first came to him
seeking someone to machine parts for a gun. A couple of weeks later, Bond returned, told Pilant
he had been fired from ADC "a day or so before," and inquired whether he was still available for
machine work. Three weeks after that, Bond returned with some "very preliminary" design work
he had done on a computer Pilant had loaned him. Thereafter, Pilant worked on gun parts while
Bond modified the design.
mona bond
          Bond's wife, Mona, testified about conversations with him, about the work he did on the
computer that he borrowed a week and a half before he was fired, and about rushing the project
to be ready for the 1993 Shot Show. She described the process for obtaining space at the show
and said they did not go to the 1994 show because of the temporary restraining order. She
testified that they had received an offer to sell Texas Arms prior to the lawsuit but had received
no offers since.
SUFFICIENCY OF THE EVIDENCE
OF NO PROBABLE CAUSE
          ADC's first point concerns the fourth element of Bond's malicious prosecution claim.


 It
asserts that the evidence is legally or factually insufficient to support the jury's finding that ADC
lacked probable cause for the proceeding. As usual, when both legal and factual sufficiency points
are asserted, we address the legal sufficiency point first. Marshall v. Ford Motor Co., 878
S.W.2d 629, 631 (Tex. App.—Dallas 1994, no writ) (citing Glover v. Texas Gen. Indemn. Co.,
619 S.W.2d 400, 401 (Tex. 1981)).
          When the complaining party raises a "no-evidence" point


 challenging the legal sufficiency
of the evidence to support a finding that favors the party who had the burden of proof on that
finding, we must sustain the finding if, considering only that evidence and the inferences which
support the finding in the light most favorable to the finding and disregarding evidence and
inferences to the contrary, any probative evidence supports it. See Browning-Ferris, Inc. v.
Reyna, 865 S.W.2d 925, 928 (Tex. 1993).
          The Supreme Court has said that a no-evidence point can only be sustained when the record
reveals one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law
or rules of evidence bar the appellate court from giving weight to the only evidence offered to
prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4)
the evidence conclusively establishes the opposite of a vital fact. Juliette Fowler Homes, Inc. v.
Welch Assoc., Inc., 793 S.W.2d 660, 666 n.9 (Tex. 1990).
          The historical statement of the legal sufficiency test is found in Brookshire Grocery Co.
v. Richey, 899 S.W.2d 331, 334-35 (Tex. App.—Tyler 1995, writ granted), a malicious
prosecution case that arose out of a prior criminal proceeding. The Tyler court applied the rule
that if reasonable minds cannot differ from the conclusion that the evidence offered to support the
existence of a vital fact lacks probative force, it will be held to be the legal equivalent of no
evidence. Id. at 335. "When the facts which bear on probable cause are not in dispute, the issue
of probable cause is a question of law to be decided by the court." Id. at 334 (citing Montgomery
Ward & Co. v. Kirkland, 225 S.W.2d 906, 908 (Tex. Civ. App.—San Antonio 1949, writ ref'd
n.r.e.)).
          Appellate review of the legal sufficiency of the evidence supporting a negative finding
always presents unusual problems. See Lyons v. Millers Casualty Ins. Co. of Texas, 866 S.W.2d
597, 600 (Tex. 1993). Among these is the "conundrum of a reviewing court scouring the record"
to evaluate a claim that there is "no evidence" of a negative fact—here, the fact of no probable
cause. See id. We borrow from the review process used by the Supreme Court in Lyons to review
findings of bad faith by an insurance company, which includes a review of a negative finding
because one element of bad faith is "no reasonable basis" for denying a claim:
[W]hen a court is reviewing the legal sufficiency of the evidence supporting a bad faith
finding, its focus should be on the relationship of the evidence arguably supporting the bad
faith finding to the elements of bad faith. The evidence presented, viewed in the light most
favorable to the prevailing party, must be such as to permit the logical inference that the
insurer had no reasonable basis to delay or deny payment of the claim, and that it knew or
should have known it had no reasonable basis for its actions.

Id. We believe that a similar process can and should be used to review a finding of no probable
cause in the context of malicious prosecution. Applied to these facts, we inquire whether the
evidence, viewed in the light most favorable to Bond, permits the logical inference that ADC had
no probable cause to believe that Bond had misappropriated its trade secrets. See id. We focus
not on whether ADC's claim was valid, but on the reasonableness of its conduct in instituting the
suit. See id. at 601. The evidence we consider is that which relates to the tort issue of probable
cause, not just to the issue of whether Bond actually misappropriated ADC's trade secrets. See
id. at 600.
          Thus, we consider only events that occurred before ADC sought injunctive relief against
Bond. Akin v. Dahl, 661 S.W.2d 917, 920 (Tex. 1983) (events subsequent not material to the
beliefs and motives at the time proceedings were instituted), cert. denied, 466 U.S. 938, 104 S.Ct.
1911, 80 L.Ed.2d 460 (1984).


 We consider only evidence of ADC's beliefs, motives, and good
faith in making its determination to file suit. See id. at 921. We reiterate that we are not engaged
in a review of the jury's finding that Bond did not misappropriate ADC's trade secrets—only the
finding that ADC had no probable cause to believe that he did.
          Bond contemplated selling to the public a product that was in competition with ADC's
products. It conclusively appears from the record that some of the details of the design and
process used by ADC to manufacture its derringers were of a type that are subject to protection
in equity as trade secrets. Hyde Corp., 314 S.W.2d at 776. The information that ADC considered
confidential included its drawings, the knowledge it gained through experience over several years
of manufacturing derringers, various features that had been discussed within the company while
Bond was an employee, and customer complaints and comments. The most unique information
was that derived from customer complaints.
          Bond's employment by ADC gave rise to a duty not to use ADC's proprietary information
and trade secrets in a manner adverse to it. Miller Paper, 901 S.W.2d at 600 (holding that the
duty arises out of the employer-employee relationship). Although the information was not
patented, it need not be. K & G Oil Tool, 314 S.W.2d at 789. That Bond might have learned
about derringers through other means, such as inspection, books, parts lists, and the like, does not
necessarily mean that ADC knew that he did so. See id. at 788. "The question is not, `How
could he have secured the knowledge?' but `How did he?'" American Precision, 764 S.W.2d at
277.
          Bond admits that he gained full knowledge of the details of the design, the manufacturing
process, and customer comments and complaints while he was an employee of ADC. Indeed,
ADC employed Bond to learn all about and improve its product. Within six months of his being
fired, ADC learned that Bond was offering a similar gun for sale. ADC knew that Bond had
access to all of the information that it possessed about how to manufacture derringers, including
its customer complaints.
          We find that ADC had a legitimate interest in protecting confidential information relating
to the design and manufacture of its derringer. We start with a presumption that ADC acted
reasonably and in good faith and therefore had probable cause to institute the suit. Ellis County
State Bank v. Keever, 888 S.W.2d 790, 794 (Tex. 1994); Akin, 661 S.W.2d at 920. Evidence of
events that occurred after ADC filed suit is not evidence of no probable cause. Akin, 661 S.W.2d
at 920 Evidence of acts that Bond took before ADC filed suit is not evidence of no probable
cause, unless ADC knew or should have known about them. Id. Evidence of other sources of
information which Bond used but which ADC did not know that he used is not evidence of no
probable cause. See American Precision, 764 S.W.2d at 277. Viewing the remaining evidence
from the standpoint of a reasonable, prudent person under the circumstances with which ADC was
faced, we find no evidence that the motives, grounds, beliefs, and other evidence upon which
ADC acted were not probable cause to institute the proceeding that resulted in the injunction being
issued. See Akin, 661 S.W.2d at 920; Brookshire Grocery, 899 S.W.2d at 337. Considered
another way, that evidence, when viewed in the light most favorable to Bond and taking into
account the law on trade secrets that we have outlined, does not permit the logical inference that
ADC had no probable cause to believe that Bond had misappropriated its trade secrets. See Lyons,
866 S.W.2d at 600. We sustain point one.
          Because we sustain a legal-sufficiency point, we will reverse the judgment and render
judgment that Bond take nothing by his counterclaim. Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d
176, 176 (Tex. 1986) (generally, if the court of appeals sustains a "no evidence" point, it is the
court's duty to render judgment for appellant) (quoting National Life Accident Ins. Co. v. Blagg,
438 S.W.2d 905, 909 (Tex. 1969)).
OTHER POINTS
          Having decided that there is no evidence to support one of the findings essential to Bond's
counterclaim, we do not reach the points of error complaining of the damages he was awarded,
the court's charge to the jury, or the award of attorney's fees.
ANTITRUST COUNTERCLAIM
          During the presentation of his case, Bond's counsel stated:
Your honor, [counsel for ADC] and I have discussed a stipulation regarding certain
individuals that have testified in deposition, by deposition in this case, and their testimony
goes to the antitrust action that we brought to be our counterclaim, and at this point we
would -- the stipulation between [counsel] and I is that if the following persons were called
to testify in this case, that they would testify to those things testified to by them in their
depositions taken in this case. And I'm going to offer the transcript of those depositions
to the Court to consider as evidence on the antitrust cause of action. Those persons are Ed
Petrich, Jimmy Seay, S-E-A-Y, Ken Remson, R-E-M-S-O-N, and Jerry Ahern, A-H-E-R-N.
Counsel for ADC agreed to the stipulation. The court said, "All right. Is that the sum and
substance of it." Counsel for Bond replied, "That is the sum and substance, Your Honor."
          During the charge conference, Bond submitted several proposed questions on his anti-trust
theory for inclusion in the charge. The court refused them all.
          Without citation of any authority, any references to the record, or discussion about which
proposed questions he contends should have been submitted, Bond asserts in a cross-point that the
court erred in refusing to submit the antitrust theory to the jury "based upon the evidence
presented during the trial of this case."
          We hold that the cross-point has been waived for failure to (1) set out a fair, condensed
statement of the facts pertinent to the cross-point, with references to the pages in the record where
those facts may be found, (2) discuss the facts and the authorities relied upon to maintain the point,
and (3) set out in full the questions that Bond contends should have been included in the court's
charge. Fredonia State Bank v. American Life Ins. Co., 881 S.W.2d 279, 284-85 (Tex. 1994);
Tex. R. App. P. 74(f), (p).
CONCLUSION
          We reverse the judgment of the trial court and render judgment that Bond take nothing by
his counterclaim. All costs of appeal are adjudged against Bond as appellee.



                                                                                 BILL VANCE
                                                                                 Justice
Before Justice Cummings,
          Justice Vance, and
          Chief Justice McDonald (Retired)
Reversed and judgment rendered
Opinion delivered and filed June 19, 1996
Publish