Affirmed and Majority Opinion and Concurring and Dissenting Opinion
filed January 25, 2007








 

Affirmed and Majority Opinion and Concurring and Dissenting
Opinion filed January 25, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-01088-CV

____________

 

RAVIN SHARMA, ASHVIN DHINGRA, AMIT
BANSAL, JAMES REW, CHEMTRADE SOLUTIONS, INC., YANG WOO CHEMICAL AMERICA, INC., 
J & J CHEMTRADING, INC., Appellants

 

V.

 

VINMAR INTERNATIONAL, LTD., VINMAR
OVERSEAS, LTD.,
Appellees

 



 

On Appeal from the 333rd
District Court

Harris County, Texas

Trial Court Cause No. 05-42636

 



 

M A J O R I T Y   O P I N I O N








This is an accelerated, interlocutory appeal[1]
from the granting of a temporary injunction against appellants, Ravin
Sharma, Ashvin Dhingra, Amit Bansal, James Rew, Chemtrade Solutions, Inc. (AChemtrade@), Yang Woo
Chemical America, Inc. (AYang Woo@), and J & J
Chemtrading, Inc. (AJ & J@) in favor of
appellee Vinmar International, Ltd. (AVinmar@).[2]
After conducting a two day evidentiary hearing the trial court entered a
temporary injunction that, among other things, prohibits appellants from: (1)
using or subleasing certain chemical storage tanks in Hamina, Finland for the
purpose of storing isoprene monomer purchased from Russia; and (2) purchasing,
transporting, storing, marketing, selling or trading isoprene monomer that is
produced in Russia or caprolactum either supplied from Mexico or Belarus or
sold in China.[3]

In six issues, the Rew appellants contend the trial court
abused its discretion by granting a temporary injunction because (1) the
allegedly injured party, Vinmar Overseas, Ltd. (AVOL@), was not before
the trial court during the temporary injunction hearing; (2) the temporary
injunction exceeds the relief requested by appellees; (3) the trial court
blocked discovery and excluded evidence that prevented appellants from
presenting their defense of unclean hands; (4) appellees did not prove they
owned trade secrets; (5) appellees did not prove they would suffer irreparable
injury for which they had no adequate legal remedy; and (6) the temporary
injunction is overbroad as it is not narrowly tailored to protect trade
secrets, and prevents lawful competition. We affirm.

Procedural Background








On June 29, 2005 Vinmar brought suit against appellants
requesting a temporary restraining order, temporary and permanent injunctions,
and other relief. That same day, Vinmar obtained a temporary restraining order
against appellants. The temporary injunction hearing occurred on August 15 and
16, 2005. On August 19, 2005 VOL intervened in the litigation. No motion to
strike VOL=s intervention was filed. On October 3, 2005 the trial
court issued its Amended Order for Issuance of Temporary Injunction. This
interlocutory appeal followed.

Factual Background[4]

A.      Vinmar Is
a Successful Trading Company.

Vinmar is an international chemical trading company
conducting business all over the world. Vinmar has been in business for almost
twenty-eight years and has grown from four original employees to more than 250
employees in offices around the globe. In 2004 Vinmar=s gross revenues
exceeded $1.3 billion.

B.      Vinmar=s Trade Secrets
Are a Key to Vinmar=s Success.








The trading of chemicals is a personal business built on
relationships between the suppliers, traders, and purchasers of the products.
Successful trading companies like Vinmar devote time, money, and resources to
develop the best contacts they can get and they encourage their employees to
develop strong relationships with their supplier and customer contacts. Vinmar
has spent years and millions of dollars developing the knowledge base behind
its successful trading business. Vinmar=s confidential
knowledge base includes customer contact information. This contact information
is more than just the knowledge that a particular company manufactures or
purchases a particular chemical. It includes information such as who is the
actual person at a particular company with the decision making authority, the
fact the person responsible for purchasing a chemical has particular
preferences such as shipping methods, or the company has particular needs that
might be geographical, seasonal or other factors. Vinmar=s confidential
knowledge base also includes product information such as the requirements for
storing a particular chemical; sales and purchase histories which provide trend
information about the growth or shrinking of a particular customer=s needs or
supplier=s product
availability; profitability of Vinmar=s traders; profit
margins and pricing policies; internal documents and forms; terms of
arrangements with customers and suppliers; structure of contracts; costs and
expenses; and terms of financing arrangements. Finally, Vinmar=s supply chains
for moving a chemical from its place of manufacture to Vinmar=s customers is
part of Vinmar=s confidential knowledge base. This knowledge base
gives Vinmar an advantage over their competitors, and they vigorously protect
the secret nature of this information.

Vinmar does not publicize this information and has devoted
significant time, effort, and resources to maintaining the confidential nature
of this information. Vinmar=s steps to protect the secrecy of this
knowledge base include: controlled access cards are required to enter Vinmar=s offices,
computers are password protected, all employees are required to execute
confidentiality agreements acknowledging the confidential and secretive nature
of the information as a condition of employment, employee manuals emphasize the
confidential nature of Vinmar=s business, and access to information is
on a need-to-know basis such that Vinmar=s traders cannot
look at each other=s files. The trial court found Vinmar=s confidential
information qualifies as trade secrets.

C.      The
Individual Appellants= Roles at Vinmar.

The individual appellants (Rew, Sharma, Bansal, and
Dhingra) are all former Vinmar employees. Each individual appellant, as a
condition of employment, was required to execute a confidentiality or
non-competition agreement containing a confidential information provision. Each
agreement, regardless of the title, prohibited each employee, while employed by
Vinmar, from investing in or engaging in a business competing with Vinmar. In
addition, the agreements required each employee to maintain the confidentiality
of all information related to Vinmar=s business.








In 1997, Vinmar hired Rew. Prior to joining Vinmar, Rew had
never worked as a chemical trader. While at Vinmar, Rew primarily traded
styrene. By the time he resigned for unstated personal reasons in July 2003,
Rew had risen to the position of general manager of Vinmar=s chemical
division. In that position, Rew had access to the profit files of all chemical
traders and products and knew the profitability of the various transportation
chains.  Two months before he resigned from Vinmar, Rew established J & J,
a Hong Kong company, as a direct competitor of Vinmar. Rew owns forty percent
of J & J and J. D. Choi owns the remaining sixty percent. Prior to the
incidents underlying this litigation, the vast majority of Rew=s business at J
& J involved the trading of styrene. In fact, Rew describes himself as the
world=s biggest styrene
trader. In addition to J & J, Rew is involved with Yang Woo.[5]
Prior to the events underlying this litigation, Rew, J & J, and Yang Woo
had not traded isoprene or caprolactum.

Bansal was a manager of banking and documentation at
Vinmar. Through his position, Bansal gained access to every sales contract in
Vinmar=s chemical
division. As part of his duties, Bansal saw most of the documents that defined
a trade and would create a sales folder for each trade that included, among
other things, the customer and price. Banking, finance, and letters of credit,
all items within Bansal=s responsibilities, are critical to Vinmar=s financial
success as they ensure Vinmar gets paid.

Dhingra was the head of operations, finance, and risk
management for Vinmar. In his position as risk manager, Dhingra assessed all of
Vinmar=s chemical trading
contracts to verify the traders were in compliance with Vinmar=s policies and
that supply and sales contracts matched up. In this role, Dhingra had access to
most contracts and all of the traders= files and
meetings. 








Despite the doubts of Hemant Goradia, the current president
of Vinmar, Vinmar hired Sharma straight out of business school as a
trainee-trader in 1997. When he was hired, Sharma was instructed by Vinmar
management to develop new business lines and this ultimately led to the
development of Vinmar=s Russian isoprene business. By the time
Sharma resigned from Vinmar, he was the marketing manager and global product
leader for isoprene and caprolactum, the chemicals he traded for Vinmar.

D.      Sharma=s Involvement With
Isoprene and Caprolactum.








When Sharma started work for Vinmar with the assignment of
developing new product lines, he spent several months researching products,
markets, suppliers, and customers. One of the products Sharma investigated was
isoprene. Isoprene is a relatively rare chemical product used in the
manufacture of various adhesive products such as that used in sticky pads.
Because international demand is high for isoprene and it is a relatively rare
product, the potential profits to be made from trading isoprene are high.
However, isoprene is a very unstable product as it must be kept pressurized.
Because of the volatile nature of isoprene, working out a secure supply chain
was not a simple or quick task. Sharma, in conjunction with Vinmar=s Russian agent,
Kachire Enterprises, Limited (AKachire@), began searching
for sources of isoprene in Russia in 1998. It was not until 1999, after much
trial and error, that Sharma and his Kachire associates located a Russian
supplier of isoprene,[6]
customers for the isoprene, and worked out the logistics for getting the
isoprene from the Russian supplier to Vinmar=s customers. It
was then that Vinmar made its first isoprene trade.

Initially, the isoprene was shipped in specialized rail
cars from the manufacturer to Hamina, Finland where the isoprene was loaded
directly onto tankers. While Sharma started searching for a storage tank in
1999, as soon as he located a Russian source of isoprene, a tank became
absolutely essential to Vinmar=s isoprene business in 2003 when Finland,
for environmental reasons, banned the loading of isoprene directly from rail
cars onto tankers.  In 2003, Sharma negotiated the lease of an isoprene capable
storage tank in Hamina, Finland. VOL was the lessee of the tank. Sharma
described the Hamina storage tank as the key to the entire isoprene business.
Both VOL and Vinmar used the Hamina tank to store isoprene. Sharma was the
Vinmar employee charged with the responsibility of maintaining the lease of the
Hamina tank.

Despite the fact isoprene is a chemical in high demand and
short supply, Vinmar=s isoprene business did not become
profitable until 2003. Sharma, in a March 2005 email to Goradia, wrote: Aour efforts to
stick with the product inspite [sic] of initial losses made on the first few
deals six years ago (not including all of the logistical nightmares we had) and
management hesitation to continue with it, is finally paying off now in a big
way.@ That payoff was
$5.5 million profit in the first five months of 2005 alone, with Sharma
predicting the profits would continue for the foreseeable future.

In similar fashion, Sharma developed Vinmar=s caprolactum
business. Sharma made the initial contact with Univex, S. A., a caprolactum
manufacturer in Mexico. From that initial contact Sharma learned about Univex=s products and in
his effort to develop the relationship and convince Univex to do business with
Vinmar, Sharma completed the first transactions at a loss for Vinmar. In
addition, Sharma worked with Kachire to develop Vinmar=s caprolactum
business out of Belarus. In both instances, Vinmar sold the caprolactum in
China.








E.      Sharma
Plots to Leave Vinmar, Join Rew, and Take the Hamina Tanks.

Despite being paid $352,000 in salary and bonus in 2004,
during the spring of 2005 Sharma became dissatisfied with his role at Vinmar.
Almost simultaneously with Sharma=s rising
discontent, in April 2005 Rew was approached by a client seeking isoprene. Rew
attempted, through the use of the internet, to obtain isoprene on his own. Rew=s effort was
unsuccessful. Following that unsuccessful effort, in May 2005 Rew started
talking to his friend Sharma about hiring Sharma. As part of this effort,
during the middle part of May, Rew, a resident of Houston, Texas, invited
Sharma, also a resident of Houston, Texas, to a meeting in Hong Kong to discuss
not only hiring Sharma, but the creation of Worldchem, a new chemical trading
company. Rew also invited Abbas Sadakat and Manjul Jain, both Kachire employees
who worked closely with Sharma, to the meeting. Abbas attended the meeting,
Jain did not.[7]
During the meeting, the participants also discussed the isoprene capable
storage tanks at Hamina. Not coincidentally, VOL=s deadline to
renew the  Hamina tank lease was May 31, 2005. This knowledge was possessed
only by key Vinmar employees such as Sharma, and Finngas, the lessor of the
tank.  By late May, Sharma, who had decided he was definitely going to leave
Vinmar, began discussions with Abbas and Rew about opening an office in Moscow.
In addition, Sharma gave Rew an isoprene summary Sharma prepared while working
for Vinmar. This summary contained information about product demand, customers,
and suppliers. Sharma also admitted he gave J & J Vinmar=s Mexican
caprolactum contact information. Sharma knew Rew intended to go after the
Hamina tanks.  Upon his return from the Far East, Sharma spent the latter part
of May avoiding direct contact with Viejo Virtanen, the manager of the Finngas
Hamina tank farm. 








While Sharma was making his own plans, Vinmar was
attempting to maintain its control over the Hamina tank and, in fact, increase
the number of tanks it had under lease. In April 2005, Goradia instructed
Sharma to not only renew the Hamina tank, but to also get the only other
isoprene capable tank at Hamina under lease as well. As of May 31, 2005,
Finngas was ready to lease both tanks to Vinmar for a three month period at the
existing rental rate.  Sharma represented to Vinmar that he was taking care of
renewing the Hamina tank lease and specifically stated he had obtained a one
week extension to the May 31, 2005 renewal deadline.

On June 1, Rew telephoned Virtanen about leasing the
isoprene tanks. Virtanen, who had never heard of J & J or Yang Woo prior to
Rew=s call, confirmed
he had tanks, but was not currently negotiating on them. The next morning
Finnish time, but still June 1 in Houston, Sharma called Virtanen and told him
he had left Vinmar, was joining Rew, and he was interested in leasing the
isoprene tanks for his new company. Sharma asked Virtanen not to lease the
tanks before he was able to arrange delivery of financial information about Rew=s companies. Following
that conversation, at 11:25 p.m. Houston time, Rew emailed Virtanen financial
information about J & J and Yang Woo. Rew copied Sharma on the email. On
June 2, at 12:29 a.m. Houston time, Sharma sent Virtanen an email titled ATank Confirmation@  in which Sharma,
still a Vinmar employee, represented he had left Vinmar and confirmed Rew=s offer to lease
both isoprene tanks at Hamina for a period of 6 months. Sharma finally
submitted, via email, his resignation from Vinmar at 3:14 a.m. on June 2, 2005.


Goradia learned the Hamina tanks had not been leased by
Sharma on June 1. Vinmar then contacted Virtanen to inform him Vinmar wanted to
keep the tanks. In a June 2 conference call, Goradia learned Virtanen had made
repeated attempts during May to contact Sharma about renewing the tank lease
and Sharma had not responded. Goradia also learned there had not been a one
week extension granted to Vinmar by Virtanen as Sharma had represented.








Faced with competing offers on the two isoprene tanks,
Virtanen consulted with the owner of the Hamina tank farm and the decision was
made to stick with Vinmar, a known risk. Rather than call Vinmar, Virtanen
instead called Sharma at home with the news that Finngas had decided to go with
Vinmar. Sharma immediately upped his offer  to double the rent and they would
pay the entire rental amount in advance. As it was double the money and no
risk, Finngas leased both tanks to Sharma and Rew. Sharma signed the lease on
behalf of Yang Woo.[8]
Virtanen refused to identify the new lessee of the isoprene tanks to Vinmar.

By June 5, only days after he left Vinmar, Sharma had not
only given J & J the contact information for the persons he did business
with while at Vinmar, he had arranged a caprolactum shipment for J & J from
Univex, the same supplier he used while at Vinmar.  This caprolactum was
shipped to Shanghai, China using the same port, Manzanilla, that he used while
at Vinmar, and was sold to many of the same customers. In a matter of weeks,
Sharma had completed six Mexican caprolactum shipments. Sharma was also working
on caprolactum trades out of Belarus just as he had done for Vinmar. 

Sharma also quickly negotiated a Russian isoprene shipment,
2,000 metric tons for July delivery, for J & J. This was something both Rew
and Europa Polimari E & I, the largest oil company in Italy, had been
unable to arrange in the past. In addition, Sharma, using the same ship broker
he had used while at Vinmar, negotiated a six month contract with a shipping
company to provide transport for isoprene out of Hamina. This contract was to
commence on July 1, 2005, the day after Vinmar=s tank lease
formally expired. The ship broker mistakenly sent the email confirming this
deal to Sharma=s old Vinmar email address, finally revealing the
extent of Sharma=s activities and the identity of the new
lessee of the Hamina tanks.








F.       Bansal
and Dhingra Plot to Leave Vinmar and Join Sharma and Rew.

Both Bansal and Dhingra remained at Vinmar after Sharma
resigned. Although he was still a Vinmar employee, Dhingra did not tell Vinmar
he knew Sharma was the person trying to take control of the Hamina tanks. On
June 6, Bansal and Dhingra set-up Chemtrade Solutions, Inc. (AChemtrade@) to provide
logistics and documentation services in support of Rew=s and Sharma=s trades. These
services were identical to the job Bansal performed at Vinmar. On June 7, after
learning Dhingra had requested a copy of the Hamina tank lease on May 15 or 16,
Goradia fired Dhingra. Even after Dhingra was fired, Bansal remained at Vinmar
and even represented he was a loyal employee when directly questioned by
management.

On June 10, Dhingra and Rew talked about Chemtrade handling
logistics and documentation for Sharma=s caprolactum
trades. Following those discussions, Dhingra drafted a secrecy and
non-competition agreement, which Rew signed on behalf of J & J.  Dhingra
and Bansal wanted to protect their trade secrets from disclosure. Chemtrade and
J & J agreed that customers, suppliers, and technical data were all trade
secrets. Following that agreement, Chemtrade handled the logistics and
documentation for Sharma=s caprolactum trades. Bansal worked on
these trades while he was still employed by Vinmar. In exchange for these
services, J & J paid Chemtrade $50,000. This was an unusually high
commission for these types of services and Bansal admitted it was really a
payment by J & J to support Chemtrade=s start-up. Part
of that money was used to make the initial payment for Houston office space for
Chemtrade, which would be shared with Sharma and Rew. Bansal admitted he looked
for that office space, along with Sharma and Rew, while he was still employed
at Vinmar on a day when he had called in sick.

 

 








G.      The
Temporary Injunction Hearing.

Larry Leibrock, a neutral forensic computer analyst jointly
hired by the parties pursuant to court order, was the first witness. Leibrock
testified his preliminary analysis of Sharma, Bansal, and Dhingra=s computers
located approximately 321,000 hits using the key word search AVinmar.@ According to
Leibrock, this translates into thousands of Vinmar documents on those
computers. These documents dated from as early as 1988 and included an Excel
spreadsheet containing credit card numbers belonging to Vinmar employees.
Finally, Leibrock testified the preliminary investigation revealed indications
of potential spoliation.

During the temporary injunction hearing Sharma, while
denying he had any Vinmar trade secrets, admitted that some Vinmar information,
such as the margins and profitability of isoprene and caprolactum, are trade
secrets.[9]
Bansal also testified Vinmar=s customers, suppliers, and technical data
are trade secrets. In addition, Bansal admitted he continued working on the
caprolactum trade documentation after the temporary restraining order was
entered. Dhingra testified that unless he was enjoined from doing so, he did
not consider himself constrained from passing on any Vinmar information other
than bank accounts. According to Dhingra, everything else was public
information.








Finally, there was remarkable testimony in which Sharma and
Bansal admitted lying under oath. Sharma admitted lying under oath about his
involvement with the Hamina tank lease negotiations by J & J and Yang Woo
and the Mexican caprolactum trades. Bansal, in response to direct questioning
by the trial court, admitted he had lied during his deposition as he was
nervous and defensive during the deposition and he lies when he gets nervous
and defensive.  In addition to outright admissions of lying under oath, the
individual appellants= testimony revealed efforts at concealing
the truth about each appellant=s activities leading up to the litigation.
The testimony and documentary evidence also revealed not only an effort to
destroy relevant documents, but also an attempt by the individual appellants to
ensure a consistent story that minimized the premeditated aspects of their
efforts to gain control of the Russian isoprene trade.

Standard of Review

An applicant for a temporary injunction seeks extraordinary
equitable relief. In re Tex. Natural Res. Conservation Comm=n, 85 S.W.3d 201,
204 (Tex. 2002). The sole issue before the trial court in a temporary
injunction hearing is whether the applicant may preserve the status quo of the
litigation=s subject matter pending trial on the merits. Butnaru
v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002); Davis v. Huey,
571 S.W.2d 859, 862 (Tex. 1978). The status quo is the last actual, peaceable,
noncontested status which preceded the pending controversy. RP & R, Inc.
v. Territo, 32 S.W.3d 396, 402 (Tex. App.CHouston [14th
Dist.] 2000, no pet.). An applicant must plead and prove three elements to
obtain a temporary injunction: (1) a cause of action against the defendant; (2)
a probable right to the relief sought; and (3) a probable, imminent, and
irreparable injury in the interim. Butnaru, 84 S.W.3d at 204.








The applicant for the temporary injunction is not required
to establish that he or she will prevail upon a final trial on the merits. Walling
v. Metcalfe, 863 S.W.2d 56, 58 (Tex. 1993). The merits of the applicant=s suit are not
presented for review. Davis, 571 S.W.2d at 861. Our review is strictly
limited to whether the trial court clearly abused its discretion in granting
the temporary injunction. Id. at 862. We may not substitute our judgment
for that of the trial court by vacating or modifying an injunction simply
because we would have decided the issue differently. Landry=s Seafood Inn
& Oyster Bar-Kemah, Inc. v. Wiggins, 919 S.W.2d 924, 926 (Tex. App.CHouston [14th
Dist.] 1996, no writ). Further, we may not reverse the trial court=s order granting a
temporary injunction unless its decision was so arbitrary that it exceeded the
bounds of reasonable discretion. Butnaru, 84 S.W.3d at 204.  The trial
court does not abuse its discretion if the applicant pleads a cause of action
and presents some evidence tending to sustain that cause of action. RP &
R, Inc., 32 S.W.3d at 402. This court will not assume the evidence taken at
a preliminary hearing will be the same as the evidence developed at a full
trial on the merits. Davis, 571 S.W.2d at 862. Furthermore, as the trial
court functions as the fact finder in a temporary injunction hearing, an abuse
of discretion does not exist where the trial court bases its decision on
conflicting evidence. Davis, 571 S.W.2d at 862; Nelkin v. Young,
397 S.W.2d 956, 958 (Tex. App.CTexarkana 1965, writ refused n.r.e.). As
the reviewing court, we must draw all legitimate inferences from the evidence
in the light  most favorable to the trial court=s order granting a
temporary injunction. T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.,
965 S.W.2d 18, 21 (Tex. App.CHouston [1st Dist.] 1998, pet. dismissed).

Discussion

A.      Is the
Injunction Invalid Because the Allegedly Injured Party Was Not Before the Trial
Court?








In their first issue, the Rew appellants raise several
separate but related arguments that the temporary injunction is invalid. First,
the Rew appellants contend the temporary injunction is invalid as the only
proper applicant, VOL according to the Rew appellants, was not before the trial
court at the time of the temporary injunction hearing. Second, the Rew
appellants assert the temporary injunction is invalid as VOL, again assuming
VOL is the only proper applicant, failed to specifically plead or request injunctive
relief through a timely, verified petition in intervention. Third, the Rew
appellants argue the temporary injunction is invalid as VOL, once again
assuming VOL is the only proper applicant, did not present evidence during the
temporary injunction hearing. The Rew appellants base these arguments on (1)
the undisputed fact that VOL was the lessee of the Hamina tanks; and (2) the
assumption that the only issue before the trial court during the temporary
injunction hearing was the Hamina isoprene tank. We disagree with the Rew
appellants= position that VOL was the only proper plaintiff for
the temporary injunction, thus rendering the temporary injunction invalid.

Assuming arguendo that the Hamina tank lease was the
only issue involved in the temporary injunction proceeding, Vinmar was still a
proper plaintiff to seek injunctive relief. The parties disagree whether this
is an issue of standing or capacity. A plaintiff has standing when it is
personally aggrieved, regardless of whether it is acting with legal authority;
a party has capacity when it has the legal authority to act, regardless of
whether it has a justiciable interest in the controversy. Nootsie, Ltd. v.
Williamson County Appraisal Dist., 925 S.W.2d 659, 661 (Tex. 1996).

It was undisputed that VOL was the lessee of the Hamina
isoprene tank. However, while VOL was the lessee and was billed by Finngas for
the tank throughput, there was undisputed testimony that: (1) VOL and Vinmar
functioned as agents of each other when it came to the buying, selling,
storing, and transporting of isoprene; (2) Vinmar and VOL had common ownership
and were affiliates; (3) both Vinmar and VOL not only used the Hamina tank, but
also owned the isoprene stored in it at various times during the lease;
(4)Vinmar used VOL to obtain leases on storage tanks that Vinmar could use; and
(5) Vinmar suffered damages as a result of the loss of the use of the Hamina
isoprene tank. A principal has standing and capacity to raise its own claims even
though an agent entered into the contract that is the basis of the claim. See
First Nat=l Bank of Wichita Falls v. Fite, 131 Tex. 523,
115 S.W.2d 1105, 1109B10 (1938) (holding that an agent may make
a contract for his undisclosed principal in his own name and the principal may
sue or be sued on the contract). Vinmar has both capacity and standing to bring
this litigation.








As Vinmar has both standing and capacity to bring this
temporary injunction action, whether VOL was properly joined as a party and was
entitled to injunctive relief is irrelevant and we need not address each of the
Rew appellants= arguments under this first issue.[10]
We overrule the Rew appellants= first issue.

B.      Did the
Temporary Injunction Grant More Relief Than Vinmar Requested in its Pleadings?

In their second issue, the Rew appellants argue the trial
court=s temporary
injunction should be dissolved as it grants Vinmar more relief than Vinmar
requested in its pleadings.

The Rew appellants admit Vinmar made several broad requests
for injunctive relief: (1) enjoining appellants from working for any isoprene
trading business; or alternatively, that they not sell to any Vinmar customers
or buy isoprene from any Vinmar suppliers; (2) enjoining appellants from using
or discussing Vinmar=s trade secrets; (3) enjoining appellants
from calling upon, soliciting, or sending any marketing communication of any
kind to any of the actual, or prospective customer distributors that Vinmar
disclosed to appellants; and (4) enjoining Sharma, Dhingra, and Bansal from
working for any other company with which Sharma is employed or associated. In
addition, Vinmar requested that appellants be enjoined from continuing to
benefit from the use of Vinmar=s confidential and proprietary
information.








The Rew appellants seek to impose a very specific pleading
requirement on a temporary injunction applicant such that the petition must
include the exact wording that ultimately appears in the temporary injunction
order. However, there is no rule that imposes such a strict pleading
requirement on temporary injunction applicants. Rule 682 governs the pleading
requirements for injunctive relief and it provides: ANo writ of
injunction shall be granted unless the applicant therefor shall present his
petition to the judge verified by his affidavit and containing a plain and
intelligible statement of the grounds for such relief.@ Tex. R. Civ. P. 682. In addition, the
Texas Supreme Court has not been hyper-technical in its interpretation of Rule
682. See Walling, 863 S.W.2d at 57 (holding that a trial court can grant
a temporary injunction preserving the status quo pending trial on the merits
even though the plaintiff=s prayer does not include a request for
equitable relief following trial on the merits). Here, by pleading the facts
underlying its causes of action and requesting the broad injunctive relief
stated above, Vinmar complied with Rule 682. The trial court did not abuse its
discretion when it  narrowed the broad language found in the petition and
granted Vinmar some, but not all of the injunctive relief it had asked for in
its petition. For example, rather than enjoining appellants from working for
any business trading isoprene or from making sales to any Vinmar customer or
acquiring any isoprene from any Vinmar supplier as requested by Vinmar, the
trial court enjoined appellants only from purchasing, transporting, storing,
marketing, selling or trading isoprene monomer that is produced in Russia. We
hold the trial court did not abuse its discretion when it granted injunctive
relief narrower than the relief requested by Vinmar=s pleadings. We
overrule the Rew appellants= second issue.

C.      Did the
Trial Court Err When it Refused to Permit Discovery on Appellants= Unclean Hands
Defense and Excluded Evidence on Unclean Hands?

In their third issue, the Rew appellants raise two points.
First, they argue the trial court erred when it refused to permit discovery
into Vinmar=s alleged bribery to support appellants= affirmative
defense of unclean hands. A party seeking an equitable remedy such as an
injunction, must do equity and come into court with clean hands. Neeley v.
West Orange-Cove Consol. Sch. Dist., 176 S.W.3d 746, 812 n.82 (Tex. 2005).
The allegation is that Vinmar should not be entitled to equitable injunctive
relief because of its unclean hands. Second, they contend the trial court erred
when, during the temporary injunction hearing, it excluded evidence on
appellants= affirmative defense of unclean hands.

 








(1)     The Order
Denying Discovery.

Referencing an order allegedly signed by the trial court on
August 3, 2005,[11]
the Rew appellants assert the trial court erred when it prevented discovery
into an alleged bribery scheme by Vinmar and Kachire, Vinmar=s Russian agent.
Appellate courts have jurisdiction to consider immediate appeals of
interlocutory orders only if a statute explicitly provides for appellate
jurisdiction. Stary v. DeBord, 967 S.W.2d 353, 352B53 (Tex. 1998).
Section 54.014  of the Civil Practice and Remedies Code governs the appeal of
interlocutory orders. Tex. Civ. Prac.
& Rem. Code Ann. ' 51.014 (Vernon Supp. 2006). An appellate
court must strictly construe section 51.014's grant of interlocutory
jurisdiction because the Texas Legislature intended it to be a narrow exception
to the general rule that only final judgments are appealable. Ahmed v. Shimi
Ventures, L.P., 99 S.W.3d 682, 688 (Tex. App.CHouston [1st
Dist.] 2003, no pet.). As section 51.014 does not expressly provide for the
interlocutory appeal of an order denying discovery, we are without jurisdiction
to consider this part of the Rew appellants= third issue.

(2)     The Trial
Court=s Exclusion of Testimony Concerning Vinmar=s Alleged Bribery.








During the temporary injunction hearing, appellants
attempted, through the testimony of Sharma, to introduce evidence of alleged
bribery by Vinmar and Kachire. According to the Rew appellants, this alleged
bribery prevented them from lawfully competing in the Russian isoprene market
thus establishing their unclean hands affirmative defense. Appellees objected
to this entire line of questioning, asserting the evidence was not relevant and
the trial court sustained the objection. Appellants then made an offer of proof
on this issue which the trial court heard in its entirety. Only Rew and Sharma
testified during the offer of proof. Vinmar lodged numerous objections to the
proffered testimony including hearsay, lack of personal knowledge, and leading,
which the trial court repeatedly granted. Ultimately, Rew testified he had no
personal knowledge of any bribery and Sharma=s testimony about
the alleged bribery was prefaced with phrases such as  Ato the best of my
knowledge@ and AI believe.@ The trial court
determined the proffered testimony was insufficient and ruled the testimony was
inadmissible. In their second point, the Rew appellants complain the trial
court erred when it excluded this testimony of alleged bribery by Vinmar and
Kachire.

An evidentiary ruling will not be overturned absent an
abuse of discretion. Texas Dep=t of Transp. v.
Able,
35 S.W.3d 608, 617 (Tex. 2000). The test for abuse of discretion is whether the
trial court acted without reference to any guiding rules or principles. E.
I. du Pont de Nemours Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995). An
appellant must show that: (1) the trial court erred in not admitting the
evidence; (2) the excluded evidence was controlling on a material issue
dispositive of the case and was not cumulative; and (3) the error in the exclusion
of the evidence probably caused the rendition of an improper judgment. Tex.
Dep=t of Transp., 35 S.W.3d at
617.

The testimony of Rew and Sharma is prohibited by Rule 602
of the Texas Rules of Evidence which states: Aa witness may not
testify to a matter unless evidence is introduced sufficient to support a
finding that the witness has personal knowledge of the matter.@ Tex. R. Evid. 602. As neither Rew nor
Sharma, the Rew appellants= only witnesses on this issue, had
personal knowledge of any illegal bribery by Vinmar, the trial court properly
excluded the testimony.








Even if the testimony was based on the witnesses= personal
knowledge, the trial court still properly excluded it. The Rew appellants
offered Rew=s and Sharma=s testimony in
support of their unclean hands affirmative defense. The unclean hands defense
requires that the litigation must be connected to the alleged improper conduct.
Omohundro v. Matthews, 161 Tex. 367, 341 S.W.2d 401, 410 (1960). The
trial court properly excluded the testimony as Rew and Sharma failed to
demonstrate how the alleged bribery harmed appellants. The Rew appellants argue
the testimony establishes they were harmed as the alleged illegal bribery
allowed Vinmar to unfairly dominate the Russian isoprene market thus preventing
them from lawfully competing in that market. However, as we find below, the Rew
appellants= efforts to enter the Russian isoprene market were
based entirely on the misuse of Vinmar=s trade secrets.
In other words, they were not attempting to lawfully compete. Therefore, no
action allegedly taken by Vinmar harmed any effort by the Rew appellants to
lawfully compete in the Russian isoprene market. As the Rew appellants failed
to produce any evidence as to how they were harmed by the alleged bribery, the
trial court properly excluded the testimony.  

Because the trial court did not abuse its discretion in
excluding the unclean hands testimony, we overrule the Rew appellants= third issue.

D.      Did Vinmar
Establish the Likelihood of Success on the Merits of its Trade Secrets Cause of
Action?








In their fourth issue the Rew appellants argue the trial
court abused its discretion when it granted Vinmar injunctive relief because
Vinmar failed to establish a probable right to the relief sought as Vinmar did
not prove it possessed trade secrets.[12]
Through this issue, the Rew appellants are seeking a resolution on the merits
of appellees= causes of action. This is not the purpose of an
interlocutory appeal of a temporary injunction. Davis, 571 S.W.2d at
861. In determining whether to grant trade secret protection through a
temporary injunction, a trial court does not determine whether the information
sought to be protected is, in law and fact, a trade secret; rather, the trial
court determines whether the applicant has established that the information is
entitled to trade secret protection pending the trial on the merits. IAC,
Ltd. v. Bell Helicopter Textron, Inc., 160 S.W.3d 191, 197 (Tex. App.CFort Worth 2005,
no pet.). The fact that a temporary injunction order was issued granting trade
secret protection does not mean the protected information is a trade secret. Id.
That issue will be decided upon the trial on the merits.








A trade secret is any formula, pattern, device or
compilation of information which is used in one=s business and
presents an opportunity to obtain an advantage over competitors who do not know
or use it. In re Bass, 113 S.W.3d 735, 739 (Tex. 2003). Customer lists,
pricing information, client information, customer preferences, buyer contacts,
blueprints, market strategies, and drawings have all been recognized as trade
secrets. T-N-T Motorsports, 965 S.W.2d 18 at 22. ASecret@ implies the
information is not generally known or readily available. Id. However,
the mere fact that knowledge of a product or process may be acquired through
inspection, experimentation, and analysis does not preclude protection from
those who would secure that knowledge by unfair means. K & G Oil Tool
& Serv. Co. v. G & G Fishing Tool Serv., 158 Tex. 594, 314 S.W.2d
782, 788 (1958). In Texas, courts condemn the employment of improper means to
procure trade secrets. Am. Precision Vibrator Co. v. National Air Vibrator
Co., 764 S.W.2d 274, 277 (Tex. App.CHouston [1st
Dist.] 1988, no writ). The question is not AHow could he have
secured the knowledge?@ but AHow did he?@ Id. A
person is liable for disclosure or use of a trade secret if he either (1)
discovers the secret by improper means; or (2) his disclosure and use, after
properly acquiring knowledge of the secret constitutes a breach of the
confidence reposed in him. Hyde Corp. v. Huffines, 158 Tex. 566, 314
S.W.2d 763, 769 (1958).

Upon the formation of an employment relationship, certain
duties arise apart from any written contract. Miller Paper Co. v. Roberts
Paper Co., 901 S.W.2d 593, 600 (Tex. App.CAmarillo 1995, no
writ). One of those duties forbids an employee from using trade secret
information acquired during the employment relationship in a manner adverse to
the employer. Id. This obligation survives the termination of employment.
Id. Although this duty does not bar the former employee from using the
general knowledge, skill, and experience acquired during employment, it does
prevent him from utilizing trade secrets acquired during the employment
relationship. Id. at 600B01.  

To determine whether information constitutes a trade
secret, a court applies the following six factors:

(1)     the extent to which the
information is known outside the claimant=s business;         

(2)     the extent to which the information is known
by employees and others involved in the claimant=s business;

(3)     the extent of the measures taken by the
claimant to guard the secrecy of the information;

(4)     the value of the information to the claimant
and to its competitors;

(5)     the amount of effort or money expended by
the claimant in developing the information; and

(6)     the ease or difficulty with which the
information could be properly acquired or duplicated by others.

In
re Bass, 113 S.W.3d at 739. The party claiming a trade secret need not satisfy
all six factors because trade secrets do not fit neatly into each factor every
time. Id. at 740. The status of the information claimed as a trade
secret must be determined through a comparative evaluation of all the relevant
factors, including the value, secrecy, and definiteness of the information as
well as the nature of the defendant=s misconduct. Id.
at 739.













When viewed in the light most favorable to the trial court=s order, as we
must, the evidence supports each of the six factors and the trial court=s determination
that Vinmar possessed trade secrets.[13]
There was evidence that Vinmar possessed information that was not known outside
of its business. This included Vinmar=s sale and
purchase histories that provided Vinmar with trend information about their
customers= demands and their suppliers= product
inventory. There was also evidence that Vinmar made a concerted effort to
maintain the secret nature of its information. These measures included
requiring controlled access cards to enter Vinmar=s offices;
password protection of computers; requiring all employees to execute
confidentiality agreements as a condition of employment; employee manuals that
emphasize the confidential nature of Vinmar=s business; and
limiting access to Vinmar=s trade secret information on a
need-to-know basis to the extent that Vinmar=s traders are not
allowed to look at each other=s files. There was also evidence that Vinmar
possessed trade secret information that was impossible for some one outside
Vinmar to properly acquire. This information includes the economics and margins
to be realized in the Russian isoprene trade.  There was also evidence that
Vinmar=s trade secret
information would be difficult for outsiders to duplicate. This evidence
included Rew=s testimony that he tried, and failed, to access the
isoprene market on his own, and the fact Europa Polimari E & I had been
trying, unsuccessfully, for a great deal of time to access the Russian isoprene
market. Vinmar presented evidence that it expended a great amount of time,
effort, and money developing and maintaining the isoprene trade secret
information. Sharma himself testified it took him more than a year to develop
the Russian isoprene trade and it took four years for the Russian isoprene
business to become profitable for Vinmar. Sharma also testified that he had to
make his first few Mexican caprolactum trades at a loss for Vinmar to gain
access to that supplier.  Throughout this time, Sharma was a Vinmar employee
and it was Vinmar bearing the risk and cost of developing the isoprene and
caprolactum business. There was also evidence of the great value of the trade
secrets to Vinmar: the Russian isoprene alone earned Vinmar a $5.5 million
profit in the first five months of 2005. Sharma and Bansal both admitted Vinmar
possessed trade secrets. Sharma testified that Vinmar=s margins and
profitability of isoprene and caprolactum are confidential. Bansal also
testified Vinmar=s customers, suppliers, and technical data
are trade secrets.[14]
In addition, each of the individual appellants executed agreements with Vinmar
recognizing they would receive trade secret information in the course of their
employment. Finally, the record shows that Vinmar=s success in the
isoprene and caprolactum markets was based, in large measure on its sustained
efforts over time, as well as its expertise in developing, competitively
pricing, and selling chemicals. None of this institutional knowledge can be
gleaned from general knowledge known outside Vinmar=s business.








The Rew appellants argue the trial court abused its
discretion in finding Vinmar possessed trade secrets as, according to the Rew
appellants, the information is available through public sources, such as
various trade reports, government records, and the internet. The evidence on
the public availability of information about Vinmar=s isoprene and
caprolactum business was disputed. There was evidence that the publicly
available sources of information contain mistakes, do not capture all of Vinmar=s trades, and do
not capture all of Vinmar=s trade secrets for the listed trades.
There was also evidence that no single, publicly available document revealed
Vinmar=s entire supply
chain.[15]
In addition, the evidence also indicated that the publicly available documents
had omissions such as logistics costs, handling costs, in-land freight costs,
cleaning expense, and  other expenses. Even if some of Vinmar=s information was
susceptible to discovery through independent investigation of publicly
available materials, the record does not establish that appellants obtained the
information in that manner. There was undisputed testimony appellants (other
than Rew=s initial
unsuccessful efforts prior to the events underlying this litigation) did not
actually do any internet research on isoprene or caprolactum until this
litigation had been instigated and was performed only after they were
instructed to do so by trial counsel. We defer to the trial court=s assessments
concerning the weight and credibility of the evidence on whether Vinmar
possessed trade secrets. Davis, 571 S.W.2d at 862; Nelkin, 397
S.W.2d at 958. Having determined there was some evidence reasonably supporting
the trial court=s finding that Vinmar possessed trade
secrets, we overrule the Rew appellants= fourth issue.

E.      Did Vinmar
Present Proof That Damages Would be an Inadequate Remedy?








A party seeking a temporary injunction must show it has a
probable, imminent, and irreparable injury in the interim between the temporary
injunction hearing and the trial on the merits. Butnaru, 84 S.W.3d at
204. An injury is irreparable if the injured party cannot be adequately
compensated in damages or if the damages cannot be measured by any certain
pecuniary standard. Id. That is, the applicant has to establish there is
no adequate remedy at law for damages. Cardinal Health Network Staffing,
Inc. v. Bowen, 106 S.W.3d 230, 235 (Tex. App.CHouston [1st
Dist.] 2003, no pet.). An adequate remedy at law is one that is as complete,
practical, and efficient to the prompt administration of justice as is
equitable relief. Id. In their fifth issue the Rew appellants argue the
trial court abused its discretion when it entered its temporary injunction
order as Vinmar failed to prove that damages would be an inadequate remedy. We
disagree.

When viewed in the light most favorable to the trial court=s order, the
evidence supports the trial court=s finding that
Vinmar has an irreparable injury pending trial on the merits. There was
evidence the Hamina tanks were the key to Vinmar=s Russian isoprene
trade. Further, the evidence shows appellants were attempting to hire away
Abbas and Manjul Jain, Vinmar=s key contacts at Kachire, Vinmar=s Russian agent.
There was also evidence Sharma had disclosed all aspects of Vinmar=s Russian isoprene
business and Mexican caprolactum contacts to Rew and his companies, making it a
simple task for Rew and his companies to not only enter these markets but gain
complete control over them. The evidence also demonstrated that Rew had
previously tried, and failed, to enter the isoprene trade on his own. As part
of their argument Vinmar failed to introduce evidence of irreparable harm, the
Rew appellants emphasize the fact that after losing the Hamina tank, Vinmar was
experimenting with an Estonian tank as a replacement. However, the testimony was
undisputed that it was not certain if this tank would work and Vinmar did not
have it under a long term lease for that reason. From this evidence, it was
within the trial court=s discretion to infer that appellants= misuse of Vinmar=s trade secrets
threatened Vinmar with the total loss of its very profitable isoprene business.
There was also evidence in the record that appellants= misuse of Vinmar=s trade secrets
similarly threatened Vinmar=s caprolactum business in Mexico and
Belarus.








Injunctive relief may be employed when one breaches his
confidential relationship in order to misuse a trade secret. Luccous v. J.
C. Kinley Co., 376 S.W.2d 336, 341 (Tex. 1964). Injunctive relief is also
proper to prevent a party, which has appropriated another=s trade secrets,
from gaining an unfair market advantage. T-N-T Motorsports, 965 S.W.2d
18 at 24. Irreparable harm may also be established by evidence that disclosure
of trade secret information could enable competitors to misuse the marketing
plans and strategies of the applicant and avoid the less successful strategies
as well as the risk and expense of developing the strategies. Mabrey v.
Sandstream, Inc., 124 S.W.3d 302, 319 (Tex. App.CFort Worth 2003, no
pet.). The misuse of trade secrets leading to the loss of an existing business
is another example of irreparable harm entitling an applicant to injunctive
relief. Miller Paper Co., 901 S.W.2d at 602. The potential damage caused
by the loss of Vinmar=s isoprene and caprolactum business, even
if not complete, cannot be easily calculated and therefore a legal remedy is
inadequate. T-N-T Motorsports, 965 S.W.2d at 24. We find the trial court
did not abuse its discretion in determining Vinmar has no adequate remedy at
law. We overrule the Rew appellants= fifth issue.

F.       Did the
Trial Court Grant an Overbroad Temporary Injunction?

In their sixth issue, the Rew appellants raise a dual
attack arguing the temporary injunction granted by the trial court is overly
broad. Specifically, the Rew appellants complain of the following language in
the temporary injunction order: ANo Defendant shall
engage in any way in the business of purchasing, transporting, storing,
marketing, selling or trading Isoprene Monomer that is produced in Russia or
Caprolactum either supplied from Mexico or Belarus or sold in China.@ According to the
Rew appellants, rather than protecting Vinmar=s trade secrets,
the temporary injunction is so overbroad, it prevents the Rew appellants from
lawfully competing in the Russian isoprene business and the caprolactum trade.
The Rew appellants also argue the scope of the temporary injunction is not
supported by the evidence. We disagree.

1)       Does the
Evidence Support the Temporary Injunction?








The Rew appellants argue the evidence does not support the
scope of the temporary injunction order. The Rew appellants, pointing out some
of the contested evidence before the trial court, assert the evidence did not
establish that Vinmar=s isoprene and caprolactum supply chains,
particularly the sources and customers of the chemicals, were trade secrets
deserving of protection, thus making the injunction overbroad. Once again, the
Rew appellants are not viewing the evidence in the appropriate light, which
requires us to view the evidence in the light most favorable to the trial court=s temporary
injunction order and to indulge all reasonable inferences in its favor. T-N-T
Motorsports, 965 S.W.2d at 21. There was evidence in the record, discussed
in section D above, that the supply chains for both isoprene and caprolactum
were trade secrets. In addition, there was evidence that while Togliatti was
Vinmar=s only isoprene
supplier, there was also evidence that Togliatti was the only Russian
manufacturer selling isoprene for export. There was also evidence that the
success of any Russian isoprene trade, regardless of the original source, is
dependent on the availability and use of the Hamina storage tanks. Thus there
was evidence supporting a general ban on the Rew appellants trading Russian
isoprene as it would be dependent on their possession and use of the Hamina
tanks, obtained through a wrongful disclosure of Vinmar=s trade secrets.
Finally, even if information about some parts of Vinmar=s supply chains
was publicly available, the question is not how could appellants have secured
the knowledge, but how did they obtain it? Am. Precision Vibrator Co.,
764 S.W.2d at 277. The evidence, when viewed in the proper light, establishes
the Rew appellants did not obtain the information on the isoprene and
caprolactum business through independent research and effort, but through a
breach of the confidential relationship between Vinmar and its former
employees. The evidence supports the scope of the temporary injunction.     

2)       Does the
Temporary Injunction Restrict Lawful Competition?








In this argument, the Rew appellants overlook the fact that
the sole issue before the trial court in a temporary injunction hearing is
whether the applicant may preserve the status quo of the litigation=s subject matter
pending trial on the merits. Butnaru, 84 S.W.3d at 204; Davis,
571 S.W.2d at 862. The status quo is the last actual, peaceable, non-contested
status which preceded the pending controversy. RP & R, Inc., 32
S.W.3d at 402. The evidence was undisputed the Rew appellants had not traded
any isoprene or caprolactum before the events underlying this litigation. To
completely preserve the actual status quo, the trial court would have had to
restrict the Rew appellants from doing any transactions in isoprene or
caprolactum, regardless of the source or ultimate market.  Instead of imposing
a universal ban on the isoprene and caprolactum trade, the trial court,
exercising its discretion and seeking to protect Vinmar=s trade secrets
pending the trial on the merits, chose to impose the more limited restrictions
noted above.








While ordinarily a temporary injunction should operate as a
corrective rather than a punitive measure, when a choice must be made between a
failure to provide adequate protection of a recognized legal right and the
punitive operation of the writ, the latter course must be taken.[16]
Huffines, 314 S.W.2d at 773. It is well settled that injunctive relief Amust, of
necessity, be full and complete so that those who have acted wrongfully and
have breached their fiduciary relationship, as well as those who willfully and
knowingly have aided them in doing so, will be effectively denied the benefits
and profits flowing from the wrongdoing.@ Mabrey,
124 S.W.3d at 316 (quoting Elcor Chemical Corp. v. Agri-Sul, Inc., 494
S.W.2d 204, 212 (Tex. Civ. App.CDallas  1973, writ ref=d n.r.e.)). Here,
the evidence demonstrates the Rew appellants gained access to the Hamina tanks,
the Russian isoprene market, and the Mexican and Belarusian caprolactum trade
into China solely through the improper acquisition and use of Vinmar=s trade secrets.
Far from being an overbroad order that forbids lawful competition, the trial
court=s order is
narrowly tailored to preserve the status quo by protecting the secrecy of
Vinmar=s trade secrets
and remedying the violence to the confidential relationship through which the
Rew appellants acquired those trade secrets. Mabrey, 124 S.W.3d at 310B11. As the
temporary injunction order is supported by the evidence and does not restrict
lawful competition, but instead preserves the status quo by protecting Vinmar=s trade secrets,
we overrule the Rew appellants= sixth issue.

Conclusion

Having overruled all of the Rew appellants= issues on appeal,
we affirm the trial court=s granting of the temporary injunction
order protecting Vinmar=s trade secrets.

 

 

 

 

 

/s/      John S. Anderson

Justice

 

 

 

 

Judgment rendered
and Majority Opinion and Concurring and Dissenting Opinion filed January 25,
2007.

Panel consists of
Justices Anderson, Hudson, and Guzman.

 








Appendix

Cause
No. 2005-42636

VINMAR
INTERNATIONAL, LTD.,             '          IN
THE DISTRICT COURT OF

Plaintiff,                                                          '

'

v.                                                                                 '

'

RAVIN SHARMA;
ASHVIN DHINGRA                   '                      HARRIS
COUNTY, TEXAS

AMIT BANSAL;
JAMES REW;                                 '

CHEMTRADE
SOLUTIONS, INC.;                          '

YANG WOO
CHEMICAL AMERICA, INC.;           '

J & J
CHEMTRADING, INC.;                                    '

and Others
Unknown,                                       '

Defendants.                                                     '          333RD JUDICIAL
DISTRICT

 

_______________________________________________________________________

Amended Order For Issuance Of Temporary
Injunction

_______________________________________________________________________

 

Plaintiff Vinmar International, Ltd. has filed a
verified petition for a temporary injunction and requested injunctive relief as
set forth in Plaintiff=s Verified Original Petition and Application for
Temporary and Permanent Injunctions, and Other Relief.  After due notice to the
parties, the petition for temporary injunction came on for hearing on August
15, 2005.  The parties appeared in person and by their attorneys.  After
considering Plaintiff=s application for temporary injunction, the pleadings,
evidence, and arguments of counsel, the Court finds the Plaintiff has
demonstrated a probability of success on the merits and probable injury in the
interim.  The Court therefore issues this temporary injunction, as such
injunction is necessary to preserve the status quo of the litigation pending a
trial on the merits.

 

Supporting the issuance of this temporary injunction
are the following Findings of the Court:

 

1.         Vinmar is a worldwide trading company that
buys and sells various chemicals throughout the world, including Isoprene
Monomer, Caprolactum, plasticizers, and others.

 








2.         Defendants Ravin Sharma, James Rew, Amit
Bansal, and Ashvin Dhingra are all former employees of Vinmar who executed
confidentiality and non-compete agreements with Vinmar in which each promised
not to disclose Vinmar=s confidential information or otherwise use the
information for any purpose other than to benefit Vinmar.

 

3.         Neither Defendants Sharma, Rew, Bansal, nor
Dhingra had any prior experience or training in chemical trading before joining
Vinmar.  All of their knowledge about chemical trading was acquired through
their employment with Vinmar.

 

4.         In exchange for Defendants Sharma=s, Rew=s, Bansal=s, and Dhingra=s
promises not to disclose confidential information or otherwise use the
information for any purpose other than to benefit Vinmar, Vinmar provided each
defendant with extensive amounts of confidential information and trade secrets,
as well as training in chemical trading.

 

5.         The confidential information that Vinmar
possesses and that Defendants Sharma, Rew, Bansal, and Dhingra acquired
includes information regarding:

a.         customer contact information;

b.         supplier contact information;

c.         profit margins, profitability,
and expenses;

d.         transactional histories,
including specific details of Vinmar=s
past purchases from suppliers and past sales to customers;

e.         pricing and pricing formulas;

f.          the term, leases amounts, and
other conditions of Vinmar=s leases with
Finngas for storage tanks located in Hamina, Finland;

g.         logistical details and
information regarding methods, costs, and expenses included in the
transportation, storage, handling, and delivery of Isoprene;

h.         logistical details, price,
terms and conditions relating to Caprolactum in Mexico or Belarus and the
shipment of Caprolactum to China;

i.          all information about the
cost and expenses which Vinmar incurs or has incurred in its business
operations;

j.          financial statements; and

k.         other terms of arrangements
with customers and suppliers of goods and services.

 

6.         Vinmar has expended substantial resources,
time, and money compiling, obtaining, and maintaining its trade secret,
confidential, and proprietary information.

 

7.         Defendants Sharma, Rew, Bansal, and Dhingra
acquired this information solely through their confidential relationship with
Vinmar and not through any public sources or domains.








8.         Defendants Bansal and Dhingra had access to
all of Vinmar=s confidential information in order to perform their
responsibilities in providing logistics and documentation for each chemical
traded by Vinamar.

 

9.         Using Vinamar=s confidential information, Defendants Sharma, Rew, Bansal, and Dhingra
executed trades and conducted business from locations located worldwide,
including Russia, Belarus, Europe, China, Asia, Mexico, the United States,
South America, India, and Japan.

 

10.       This confidential information is not
generally known to competitors and gives Vinmar a competitive advantage in the
chemical trading industry.

 

11.       Vinamar safeguards this information by
utilizing controlled access cards and computer passwords, as well as having
each employee execute confidentiality and non-compete agreements acknowledging
the confidential and secretive nature of the information.

 

12.       Vinmar employees were granted access to
confidential data concerning each chemical on a Aneed-to-know@basis.

 

13.       Vinmar did not publicly disclose or
otherwise divulge its confidential information.

 

14.       Vinmar=s
information maintains a substantial element of secrecy and satisfies each
factor for trade secret protection.  The information is therefore trade secret,
confidential, and proprietary information.

 

15.       Using the confidential information that they
procured from Vinmar, Defendants Sharma, Bansal, Dhingra, and Rew began
competing with Vinmar while each was still employed with Vinmar.

 

16.       These businesses were established to trade
the same chemicals, purchasing from the same suppliers, and selling to the same
customers, as Defendants Sharma, Bansal, and  Dhingra had previously done at
Vinmar.

 

17.       Defendants Sharma, Bansal, Dhingra, and Rew
never disclosed to Vinmar that each was competing with Vinmar and using the
confidential contacts and information that each procured from Vinmar to assist
competitive businesses gain advantage in the chemical trading industry.

 








18.       Defendants Sharma, Bansal, Dhingra, and Rew
have taken, used, and disclosed Vinmar=s
trade secret, confidential, and proprietary information to competitors of
Vinmar.

 

19.       Defendants Sharma, Bansal, and Dhingra have
taken, used, and disclosed Vinmar=s
trade secret, confidential, and proprietary information for the benefit of
Defendants Rew, J&J Chemtrading, and Yang Woo Chemical America.

 

20.       In May 2005, while Defendant Sharma was
still employed at Vinmar, he and Defendant Rew conspired to begin a competitive
company called WorldChem.  The two never disclosed to Vinmar that they were
establishing this competitive business.  Defendants Sharma and Rew actively
solicited other Vinmar employees, including Manjul Jain and Abbas Sadakat, to
join their competitive company.

 

21.       In May 2005, Defendants Rew and Sharma met
in Hong Kong with Abbas Sadakat to discuss the structure and layout of
WorldChem and their entry into the Isoprene market.  At this time, Sharma was
employed by Vinmar.

22.       Finngas would have renewed the Finngas
leases with Vinmar under the original terms and prices that it had previously,
but for Defendants Sharma, Bansal, and Dhingra=s acts of deception and fraud.

 

23.       In May and June 2005, Vinmar had a
reasonable expectation that it would continue to lease and control Isoprene
storage tanks from Finngas located in Hamina, Finland.

 

24.       While still employed with Vinmar, Defendant
Sharma helped Defendants Rew, J&J Chemtrading, and Yang Woo Chemical
America take the Finngas storage tank leases away from Vinmar and allowed
Defendants Rew, J&J Chemtrading, and Yang Woo Chemical America to enter the
competitive industry of Isoprene trading.

 

25.       Vinmar and its affiliated corporation,
Vinmar Overseas, Ltd. (Vinmar Overseas@),
each act, and have acted, as agent of the other with respect to the purchase,
transportation, storage and sale of isoprene produced in Russia through the
storage tanks located in Finland.

 

26.       Both Vinmar and Vinmar Overseas have been
generating revenues from the sale of isoprene and the use of the storage tank
in Finland.

 

27.       The lease with Finngas was negotiated by
Vinmar for the benefit of itself and Vinmar Overseas.

 








28.       While employed at Vinmar, Defendants Sharma
and Dhingra intentionally allowed the time for renewal of the Finngas leases to
expire.  This conduct constitutes a breach of Defendants= fiduciary duties owed to Vinmar.

 

29.       Without leases to the Finngas storage tanks,
Defendants Rew, J&J Chemtrading, and Yang Woo Chemical America would never
have been able to engage in the business of buying and selling Isoprene in
Russia.

 

30.       Neither Defendants Rew, J&J Chemtrading,
nor Yang Woo Chemical America had any experience in, or knowledge about,
buying, selling, or trading Isoprene, Caprolactum, or plasticizers prior to
June 1, 2005.

 

31.       All information that Defendants Rew, J&J
Chemtrading, and Yang Woo Chemical America have regarding Isoprene and
Caprolactum was acquired solely from Defendants Sharma, Bansal, and Dhingra. 
This information came from Vinmar and is trade secret, confidential and
proprietary.

 

32.       Defendants= use of Vinmar=s trade secret, confidential, and proprietary
information constitutes wrongful competition against Vinmar.

 

33.       Defendants Sharma, Bansal, and Dhingra
conspired with Defendants Rew, J&J Chemtrading, and Yang Woo Chemical
America to (1) convert Vinmar=s trade
secret,  confidential, and proprietary information, and (2) use Vinmar=s trade secret, confidential, and proprietary
information to wrongfully compete against Vinmar in the business of buying,
selling, and trading Isoprene, Caprolactum, and plasticizers.

 

34.       Defendants Sharma, Bansal, and Dhingra
breached fiduciary duties owed to Vinmar. Defendants Rew, J&J Chemtrading,
and Yang Woo Chemical America assisted this breach.

 

35.       Defendants Sharma, Rew, and Bansal lied
under oath on multiple occasions in this proceeding, both in depositions and at
trial.

 

36.       Rew signed an agreement with Vinmar during
the course of his employment by Vinmar that prohibited him from soliciting
employees of Vinmar for two years after the termination of his employment.

 

37.       During the two years after termination of
his employment, Rew repeatedly and continually violated the provisions of this
agreement by soliciting Sharma to come to work for him.








38.       There is some evidence that Defendants have
deleted or attempted to destroy emails and other documents in order to cover
their actions.

 

39.       Saved on Defendants Sharma, Bansal, Dhingra,
Rew, and Chemtrade Solutions personal computers are over 300,000 Vinmar
documents that Defendants took from Vinmar upon leaving the company.  These
documents were wrongfully obtained and retained by Defendants Sharma, Bansal,
Dhingra, Rew, and Chemtrade Solutions in violation of the Temporary Restraining
Order and agreements.

 

40.       All Defendants failed to timely produced
documents as previously ordered by the Court in issuing the Temporary
Restraining Order and as agreed.

 

41.       Defendants Rew, J&J Chemtrading, and
Yang Woo Chemical America have been negotiating with Vinmar=s competitors to sublease the Finngas tanks in
violation of the Temporary Restraining Order.

 

42.       Defendants have been using Vinmar=s confidential information to establish competitive
businesses and compete against the company.  Absent an injunction, Defendants
will continue to use Vinmar=s confidential
information for personal gain to the detriment of the company.

 

43.       Damages from Defendant=s misuse of Vinmar=s
confidential information are immeasurable, and there is no indication that
Defendants can satisfy an award in damages or will remain within the country to
do so.

 

44.       Defendants= conduct in competing against Vinmar, including actively trading
chemicals through contacts and sources learned at Vinmar, and including
establishing competitive businesses while each was employed at Vinamar, has
left Vinmar with no choice but to seek injunctive relief to prevent Defendants= ongoing misuse and misappropriation of Vinmar=s trade secrets.

 

45.       Vinmar has a probable right to recover
pending trial on its claim for misappropriation of trade secrets.  Vinmar owns
trade secrets.  Defendants have used Vinmar=s
trade secrets in breach of both their contractual and confidential relationship
with Vinmar, and Defendants have acquired the trade secrets through improper
means.  Rather than attempt independent investigation and research to discover
the confidential information at issue, Defendants abused their confidential
relationships with Vinmar to obtain the knowledge.

 








46.       Vinmar has a probable right to recover
pending trial on its claim for Defendants=
breach or assisted breach of the fiduciary duties each Defendant owed to
Vinmar.  Defendants acquired and abused a confidence that Vinmar reposed in
Defendants Sharma, Bansal, and Dhingra.  Defendants owed Vinmar a fiduciary
duty not to disclose Vinmar=s trade secrets
or use these trade secrets for personal gain, and Defendants betrayed this
trust.

 

47.       Vinmar has a probable right to recover
pending trial on its claim for Defendants=
fraud or conspiracy to defraud Vinmar.  Defendant Sharma represented to Vinmar
management that the tank leases would be renewed and never disclosed to
management that he was working for a competitive company to acquire the tanks. 
All  defendant [sic]assisted this conduct, and such conduct constitutes actual
and constructive fraud.

 

48.       Vinmar has a probable injury pending trial. 
Defendants possess Vinmar=s confidential information and are in a position to
continue using it to compete with Vinmar in the industry.  This threatened use
leaves Vinmar facing imminent harm and irreparable injury, with no adequate
remedy at law.

 

It is, therefore, ORDERED that this Temporary
Injunction is hereby entered and shall remain in full force and effect against
all parties enjoined therein until trial of this case.  

 

It is, therefore, ORDERED that Defendants Ravin Sharma,
Ashvin Dhingra, Amit Bansal; James Rew, Chemtrade Solutions, Inc., Yang Woo
Chemical America, Inc. J&J Chemtrading, Inc. are hereby enjoined, until the
final trial hereof, as follows:

 

1.         No Defendant shall use or
sublease the Finngas storage tanks located in Hamina, Finland for the storage
of Isoprene Monomer purchased from Russia;

 

2.         No Defendant shall engage in
any way in the business of purchasing, transporting, storing, marketing,
selling, or trading Isoprene Monomer that is produced in Russia or Caprolactum
either supplied from Mexico or Belarus or sold in China;

 

3.         Defendants shall return all
Vinamar records and documents back to Vinmar that each Defendant may possess
and shall not use the information contained in such records or documents for
any purpose;

 








4.         No Defendant shall use or
disclose to any person for any purpose any part of Vinmar=s trade secret or confidential information, which
shall mean and include all of the following:

 

(1)       All information regarding
Vinmar=s purchase or acquisition of Isoprene in Russia,
including the price, terms, and conditions of sale and the identity of all
Vinmar=s suppliers of Isoprene;

 

(2)       All information about the
transportation and storage of Isoprene including all information regarding the
Finngas storage facilities located in Hamina, Finland, and the terms,
conditions, and past history of Vinmar=s
contract or lease agreement for such facilities;

 

(3)       All information about Vinmar=s sales of Isoprene, including the prices, terms,
conditions, and type of sales transactions which Vinmar has entered into;

 

(4)       All information about Vinmar=s customers, including their purchase and
transactional histories, their general needs and requirements, and the specific
terms and conditions of the various sales and other transactions which Vinmar
has entered into with its customers, and further including the name and all
information about the person or persons who make decisions on behalf of Vinmar=s customers to purchase Caprolactum;

 

(5)       All information about Vinmar=s customers, including their purchase and
transactional histories, their general needs and requirements, and the specific
terms and conditions of the various sales and other transactions which Vinmar
has entered into with its customers, and further including the name and all
information about the person or persons who make decisions on behalf of Vinmar=s customers to purchase Isoprene Monomer;

 

(6)       Profit margins, profitability,
and expenses;

 

(7)       Pricing and pricing formulas;

 

(8)       Logistical details and
information regarding methods, costs, and expenses included in the
transportation, storage, handling, and delivery of Isoprene;








(9)       Logistical details, price,
terms and conditions relating to Caprolactum in Mexico or Belarus and the
shipment of Caprolactum to China; 

 

(10)     All information about the cost
and expenses that Vinmar incurs or has incurred in its business operations; and


 

(11)     Financial statements.

 

It is further ORDERED that this order shall be
effective upon Plaintiff posting a bond in the amount of $2,500,000.00.

It is further ORDERED that this case is set for trial
on the 3rd day of April, 2006.

 

SIGNED this 3rd day of October, 2005.

 

 

 

/s/        Judge
Joseph J. ATad@ Halbach, Jr.

Judge
Presiding

 

 

 

 

 

 

 

 

 

 









[1]  Tex. Civ.
Prac. & Rem. Code Ann. '
51.014(a)(4) (Vernon Supp. 2006).





[2]  While all defendants in the trial court collectively
filed a single notice of appeal, only appellants Yang Woo Chemical America,
Inc., J & J Chemtrading, Inc., and James Rew submitted a brief to this
court. When dealing with these appellants as a group, we shall refer to them as
Athe Rew appellants.@





[3]  The trial court=s
complete Amended Order for Issuance of Temporary Injunction is set out in the
attached Appendix.





[4]  The factual recitation is stated in the light
favoring the trial court=s ruling, with conflicts in the parties= evidence resolved in support of the ruling. T-N-T
Motorsports, Inc. v. Hennessey Motorsports, Inc., 965 S.W.2d 18, 21 (Tex.
App.CHouston [1st Dist.] 1998, no pet.).





[5]  Rew=s exact
connection with Yang Woo is not clear in the record. J.D. Choi is the sole
owner of Yang Woo. Choi and Rew formed J & J, a joint venture according to
Rew. Despite this apparent separation, Rew testified during his deposition that
people confuse the two companies as they operate as almost the same entity.





[6]  Both Sharma and Hemant Goradia, the president of
Vinmar, testified about the efforts required to locate a stable supplier of
Russian isoprene. Sharma testified the development of Vinmar=s isoprene business was a time consuming process.
First, Sharma located names in various industry publications and made initial
contact. Then, he set-up meetings, social as well as business, to develop the
relationship. Goradia testified while there are many chemical plants in Russia
listed in various industry publications as sellers of isoprene, Vinmar
eventually learned the reality is, there is only one, Togliatti, that sells for
export. According to Goradia, Vinmar learned this information by trial and
error and through the efforts of their local people. Initially, Vinmar did not
know who the proper contacts were at Togliatti, the Russian isoprene supplier, or in Russia generally
about isoprene. It took a considerable investment of time to not only make the
contact with whoever is shown in the
publications like AWho=s Who in
Chemicals@ as responsible for a particular product, but to
really identify the decision makers at the producer.





[7]  Among the issues discussed in Hong Kong was the
ownership of Worldchem. The ownership was broken down by percentages: Sharma:
25.5%, Abbas: 15%; Jain: 25.5% and Rew: 17%. The record does not reveal the disposition
of the remaining 17%.  The initial plan called for Rew to hold Jain=s ownership interest for an undetermined amount of
time. Sharma testified that Jain=s
refusal to join the new company led to its failure before it ever really got
started. However, Worldchem at least operated long enough to apply for trade
disruption insurance for its projected isoprene trade originating in Russia and
shipping through Hamina, Finland.





[8]  Originally the lease was to be in the name of J
& J. However, Rew was unable to arrange quick payment from J & J=s Hong Kong bank, so payment was made by Yang Woo.
Finngas then changed the lessee to Yang Woo. 





[9]  When Sharma denied possessing any Vinmar trade
secrets, Sharma testified all he had was his experience, trading skills, and
his relationships with customers and suppliers.





[10]  While VOL did intervene well before the trial court entered its
temporary injunction order, the trial court granted injunctive relief only to
Vinmar.





[11]  There is no August 3, 2005 order denying discovery
in the record.





[12]  Appellees argue the Rew appellants waived this issue
on appeal as they did not challenge each cause of action asserted by Vinmar in
its petition. Initially, Vinmar is incorrect when it argues the Rew appellants
must address each cause of action asserted in Vinmar=s petition as the trial court made specific findings
as to the causes of action on which Vinmar had established a likelihood of
success on the merits. See State Farm Fire & Cas. Co. v. S.S., 858
S.W.2d 374, 380 (holding in a summary judgment context that when the order
granting the summary judgment explicitly states the grounds relied upon in
granting the summary judgment and the underlying motion contains other
independent grounds for the same relief, the summary judgment can be affirmed
only on the grounds specified in the trial court=s order). These were: (1) misappropriation of trade secrets; (2) breach
or assisted breach of the fiduciary duty not to disclose Vinmar=s trade secrets; and (3) depriving Vinmar of the
Hamina storage tanks through fraud or conspiracy to commit fraud. Misuse of
Vinmar=s trade secrets by appellants is the primary basis
supporting each of these causes of action. This includes the fraud cause of
action as the terms of Vinmar=s lease with
Finngas were not known outside the contracting parties and it was only through
Sharma=s knowledge of those terms that Sharma was able to
orchestrate the takeover of the Hamina tanks. As the existence of Vinmar trade
secrets is crucial to Vinmar
establishing a probable right to the relief sought and the Rew appellants challenged
Vinmar=s proof of trade secrets, the Rew
appellants have not waived the right to raise this issue challenging the
temporary  injunction.





[13]  Within this issue, the Rew appellants argue the
trial court improperly based its temporary injunction order on a finding that
Vinmar possessed only confidential information and not trade secrets. However,
while it did use the term Aconfidential
information,@ the trial court expressly found, in finding 14, that
Vinmar=s confidential information satisfied each factor for
trade secret protection and therefore qualified as trade secrets.





[14]  Customer lists are routinely given trade secret
protection. T-N-T Motorsports, 965 S.W.2d at 22; Miller Paper Co. v.
Roberts Paper Co., 901 S.W.2d 593, 603B04
(Tex. App.CAmarillo 1995, no writ); Rugen v. Interactive Bus.
Sys., Inc., 864 S.W.2d 548, 552 (Tex. App.CDallas 1993, no writ); Am. Precision Vibrator Co. v. Nat=l Air Vibrator Co., 764 S.W.2d 274, 278 (Tex. App.CHouston
[1st Dist.] 1988, no writ); David v. Bache Halsey Stuart Shields, Inc.,
630 S.W.2d 754, 757 (Tex. App.CHouston [1st
Dist.] 1982, no writ); Collins v. Ryon=s Saddle & Ranch Supplies, Inc., 576 S.W.2d 914, 915 (Tex. Civ. App.CFort Worth 1979, no writ). 





[15]  We note that the Rew appellants= learned trial counsel, using some of these publicly
available trade reports, while questioning Hemant Goradia, president of Vinmar,
was unable to accurately recite the correct path Vinmar used to ship isoprene
out of Russia. According to the Rew appellant=s trial counsel, the isoprene was shipped by rail from Russia to
Rotterdam, then sent by tanker to the port of Hamina, Finland. In reality, the
isoprene was sent by rail to Hamina, stored in the Finngas tank and later loaded
onto a tanker. The isoprene was frequently transferred to a different tanker in
the port of Rotterdam.





[16]  We note the most expeditious way to obviate the
hardship and discomfiture of an unfavorable temporary injunction order is to
try the case on the merits and secure a hearing wherein the case may be fully
developed and the courts, both trial and appellate, may render judgments
finally disposing of controversies.  Southwest Weather Research, Inc. v.
Jones, 160 Tex. 104, 111, 327 S.W.2d 417, 422 (1959).